**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JUNE 11, 2004**

ALLAN PEDEN,

    Plaintiff-Appellee,

v                              No. 119408

CITY OF DETROIT, DETROIT POLICE DEPARTMENT,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

    We granted leave to appeal to consider two issues: (1) whether defendant, the city of Detroit, Detroit Police Department, properly characterized the essential functions or duties of a police officer position under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.,* and the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), MCL 37.1101 *et seq.;* and (2) whether plaintiff, who suffers from a permanent heart condition, has presented prima facie evidence that he is able to perform the

essential functions of this position. Regarding the first issue, the circuit court granted summary disposition in favor of defendant and the Court of Appeals subsequently reversed that judgment. Because there is no genuine question of material fact that defendant properly characterized the essential functions of the police officer position, we reverse the Court of Appeals judgment and we reinstate the circuit court's grant of summary disposition in favor of defendant. Likewise, regarding the second issue, the circuit court granted summary disposition in favor of defendant and the Court of Appeals reversed that judgment. Because there is also no genuine question of material fact that plaintiff cannot perform the essential functions of the police officer position, we reverse the Court of Appeals judgment on this issue as well. We reinstate the circuit court's grant of summary disposition in favor of defendant.

## I.  BACKGROUND

In 1986, plaintiff, Allan Peden, a police officer in Detroit's 13th Precinct, suffered a heart attack while performing clerical tasks consistent with his "A Clerk" position. Plaintiff was diagnosed with heart disease and underwent successful heart surgery. Plaintiff's physician released him to work on indefinite restricted duty. For

2

about ten years, plaintiff continued working on restricted duty status, first remaining in the "A clerk" position and eventually winning a "bidded" position with the police department's Crime Analysis Unit (CAU).

In 1995, the Detroit Police Department compiled a list of "24 Essential Job Functions of a Law Enforcement Officer" (the essential functions list or EFL). This list was based on model standards developed by the Michigan Law Enforcement Officers Training Council, a council created by statute to develop educational, mental, and physical standards for all commissioned law enforcement officers in the state of Michigan. See MCL 28.601 *et seq.* The department's list includes such tasks as pursuing suspects in foot chases, engaging in vehicle pursuits, effecting forcible arrests, overcoming violent resistance, and qualifying with a firearm.[1]

In 1996, the department placed plaintiff on involuntary, nonduty, disability retirement. The CAU physician, Dr. Hill, signed the application for early

_____

[1] Although the EFL was compiled in 1995, the record in this case indicates that, at least since 1975, the department has maintained a written job description for police officer positions providing that the duties of officers include patrolling an assigned post, enforcing

3

retirement on behalf of the department.  Dr. Hill reviewed plaintiff's medical records, including records made by plaintiff's physicians and the department's physicians over the course of several years of routine medical examinations, and determined, on the basis of those records, that plaintiff was unable to perform the EFL tasks and was therefore eligible for disability retirement.[2]

Plaintiff filed suit against defendant, alleging that the department violated the ADA and the PWDCRA when it placed him on involuntary disability retirement.  Defendant argues that plaintiff cannot perform the essential functions of his former CAU police officer position and, therefore, plaintiff is not entitled to proceed on his ADA and PWDCRA discrimination claim.  Plaintiff contends that the EFL tasks are not essential to his former CAU position because that position is essentially clerical in nature. Alternatively, plaintiff argues that he can perform the EFL

laws, apprehending violators of the law, transporting sick and injured people to hospitals, and serving warrants.

[2] For instance, Dr. Hill's summary of plaintiff's medical history includes comments made periodically by plaintiff's doctor that plaintiff should remain on restricted duty and other statements made by plaintiff's doctor and other department physicians during various examinations, such as "coronary artery disease," "[h]e is working without problems," and "advised to check with his

4

tasks.

The circuit court dismissed plaintiff's case on summary disposition pursuant to MCR 2.116(C)(10), concluding, as a matter of law, that the department is entitled to define the essential functions of a police officer position and that plaintiff failed to present prima facie evidence demonstrating that he is capable of performing those functions.

The Court of Appeals reversed, holding that a determination regarding what constitutes the essential functions of a position and whether a plaintiff is capable of performing those essential functions must be made with a case-by-case examination of the particular circumstances involved.[3] The Court of Appeals held that while defendant had presented some evidence showing that the EFL tasks are essential to a police officer position, plaintiff presented evidence raising a genuine issue of material fact regarding whether those functions are, in practice, essential to plaintiff's specific position with the CAU and whether plaintiff can perform the essential functions of his

doctor because the diastolic pressure is above normal limits."

[3] Unpublished opinion per curiam, issued March 23, 2001 (Docket No. 214491).

5

position despite his disability.

## II.  STANDARD OF REVIEW

This case presents a question of statutory interpretation that is an issue of law reviewed de novo. *G C Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 419; 662 NW2d 710 (2003).  The grant or denial of summary disposition pursuant to MCR 2.116(C)(10) is likewise reviewed de novo.  *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

## III. ANALYSIS

### A. Overview of the ADA

The ADA was enacted by Congress in part "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 USC 12101(b)(1).[4]  42 USC 12112(a),

---

[4] Plaintiff's federal ADA claim is properly before this Court because state courts enjoy concurrent jurisdiction over such claims.  In *Gulf Offshore Co v Mobil Oil Corp,* 453 US 473, 478; 101 S Ct 2870; 69 L Ed 2d 784 (1981), the United States Supreme Court stated:

> In considering the propriety of state-court jurisdiction over any particular federal claim, the Court begins with the presumption that state courts enjoy concurrent jurisdiction. Congress, however, may confine jurisdiction to the federal courts either explicitly or implicitly.  Thus, the presumption of concurrent jurisdiction can be rebutted by an explicit statutory directive, by unmistakable implication from legislative

prohibiting employment discrimination, states that "no covered entity[5] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

A plaintiff alleging a violation of the ADA carries the burden of proving a prima facie case. *Doe v Univ of Maryland Medical Sys Corp,* 50 F3d 1261, 1264-1265 (CA 4, 1995). To satisfy this burden, the plaintiff must first show that he is a "qualified individual with a disability" entitled to the ADA's protections. 42 USC 12112(a). A "disability" is defined under § 12102(2) as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a

history, or by a clear incompatibility between state-court jurisdiction and federal interests. [Citations omitted.]

Moreover, 42 USC 12202 provides that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal *or State court* of competent jurisdiction for a violation of this chapter." (Emphasis added.)

[5] A "covered entity" includes any employer who has fifteen or more employees each working day in each of twenty or more calendar weeks in the current or preceding calendar year. Section 12111(2),(5).

record of such an impairment; or (C) being regarded as having such an impairment."  A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. . . ."  Section 12111(8).

It is important to recognize that the ADA does not protect against discrimination based on *any* disabilities, but only against discrimination based on those disabilities (or perceived disabilities) that substantially limit at least one major life activity of the disabled individual, but that, with or without reasonable accommodation, do not prevent the disabled individual from performing the essential functions of the position held or sought.

After the plaintiff presents sufficient evidence demonstrating that he is a "qualified individual with a disability," his next burden lies in proving that his employer "discriminated" against him.  The ADA broadly defines the term "discriminate" to prohibit employers from undertaking a variety of measures that adversely affect qualified individuals with disabilities.  See § 12112(b).[6]

---

[6]  Generally, an employer may not purposefully discriminate through direct action, by the use of standards, criteria, or methods of administrations, or

8

Plaintiff in this case has alleged purposeful discrimination. In claims under the ADA alleging purposeful discrimination, once the plaintiff has presented a prima facie case, the burden shifts to the employer to rebut plaintiff's evidence. *Raytheon Co v Hernandez*, 540 US ___, ___; 124 S Ct 513, 520; 157 L Ed 2d 357 (2003).

B. Overview of the PWDCRA

In *Chmielewski v Xermac, Inc,* 457 Mich 593, 601; 580 NW2d 817 (1998), quoting *Allen v Southeastern Michigan Trans Auth,* 132 Mich App 533, 537-538; 394 NW2d 204 (1984), we stated that the Handicappers' Civil Rights Act (amended in 1998 and renamed the "Persons With Disabilities Civil Rights Act") "'prohibits discrimination against individuals

---

through the denial of reasonable accommodations against a qualified individual with a disability because of that individual's disability. An employer also may not utilize qualification standards, tests, or other criteria that are not job-related in a manner that has the effect of screening out qualified individuals with disabilities from the workplace. Section 12112(b).

Pursuant to § 12112(b), the United States Supreme Court has explained that "[b]oth disparate-treatment and disparate-impact claims are cognizable under the ADA." *Raytheon Co v Hernandez*, 540 ___, ___; 124 S Ct 513, 519; 157 L Ed 2d 357 (2003). Liability in a disparate-treatment case "'depends on whether the protected trait . . . actually motivated the employer's decision.' . . . By contrast, disparate-impact claims 'involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business

because of their handicapped status. The purpose of the act is to mandate 'the employment of the handicapped to the fullest extent reasonably possible.'" Under MCL 37.1202(1)(a)-(e), which prohibit employment discrimination, an "employer"[7] shall refrain from taking any of a number of adverse employment actions against an individual "because of a disability . . . that is unrelated [or not directly related] to the individual's ability to perform the duties or a particular job or position."

The plaintiff bears the burden of proving a violation of the PWDCRA. "To prove a discrimination claim under the [PWDCRA], the plaintiff must show (1) that he is [disabled] as defined in the act, (2) that the [disability] is unrelated to his ability to perform his job duties, and (3) that he has been discriminated against in one of the ways delineated in the statute." *Chmielewski, supra* at 602.

A "disability," for purposes of article 2, MCL 37.1201-37.1214, is defined in MCL 37.1103(d) as: (i) "[a] determinable physical or mental characteristic of an

necessity.'" *Id.* (citations omitted).

[7] An "employer" is defined in MCL 37.1201(b) as "a person who has 1 or more employees or a person who as contractor or subcontractor is furnishing material or performing work for the state or a governmental entity or

10

individual . . . if the characteristic: (A) . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position . . . "; (ii) "[a] history of [such a] determinable physical or mental characteristic . . . "; or (iii) "[b]eing regarded as having [such a] determinable physical or mental characteristic . . . ."  "'Unrelated to the individual's ability' means, with or without accommodation, an individual's disability does not prevent the individual from . . . performing the duties of a particular job or position."  MCL 37.1103(l)(i).

Thus, like the ADA, the PWDCRA generally protects only against discrimination based on physical or mental disabilities that substantially limit a major life activity of the disabled individual, but that, with or without accommodation, do not prevent the disabled individual from performing the duties of a particular job.  See *Sanchez v Lagoudakis (After Remand),* 458 Mich 704, 715; 581 NW2d 257 (1998).

Once the plaintiff has proved that he is a "qualified person with a disability" protected by the PWDCRA, he must

agency of the state and includes an agent of such a

next demonstrate that he has been discriminated against in one of the ways set forth in MCL 37.1202. Like the ADA, the PWDCRA prohibits employers from taking any of a variety of measures that adversely affect protected individuals.[8]

If the plaintiff presents a prima facie case of purposeful discrimination, the burden then shifts to the defendant to rebut such evidence. *Kerns v Dura Mechanical Components, Inc (On Remand)*, 242 Mich App 1, 12; 618 NW2d 56 (2000). See *also Hazle v Ford Motor Co,* 464 Mich 456, 463-466; 628 NW2d 515 (2001).

C. Essential Functions of a Detroit Police Officer

The dispute in this case primarily concerns whether the EFL tasks are essential to plaintiff's former police officer position.[9] If so, plaintiff must show that he is

---

person."

[8] Generally, an employer shall not purposefully discriminate, through direct action or by failing to provide necessary accommodation, against a person because of a disability that is unrelated to that person's ability to do the duties of a job; an employer shall not limit, segregate, or classify employees in a manner that adversely affects a person because of a disability that is unrelated to that person's ability to do the duties of a job; an employer shall not take direct adverse action against an individual on the basis of examinations that are not directly related to the requirements of the job. MCL 37.1202.

[9] Plaintiff cites *Rourk v Oakwood Hosp Corp,* 458 Mich 25; 580 NW2d 397 (1998), for the proposition that in determining the essential functions of his former position,

able, with or without accommodation, to perform these functions; otherwise, he may not proceed on a claim under either the ADA or the PWDCRA. If plaintiff shows that he is able to perform the essential functions of the position, he may proceed to demonstrate that the department discriminated against him in one of the ways set forth in the acts.

### i. The ADA

Regarding what the "essential functions" of an

we must consider the functions of the CAU position that he held before being forcibly retired rather than the functions of a patrol officer position. *Rourk* is an accommodation case in which this Court addressed whether an employer must transfer a disabled person to a *new* position that the person could perform. In holding that no transfer was required, we stated that "an individual is handicapped even if some accommodation is necessary to allow that individual to perform the duties of a particular job or position," but that "the existence of a [disability is] determined with reference to the job actually held or applied for . . . ." *Id.* at 31, 33. In other words, we held that the mere fact that a disabled person can perform "some" job is not relevant; rather, he must be able to perform *the* job he held or sought at the time the alleged PWDCRA violation occurred, and any accommodation must be directed toward enabling the plaintiff to perform the duties of *that* job. As such, *Rourk* is not directly relevant because plaintiff here is not making an accommodation argument and is not seeking transfer to a new position. Rather, plaintiff is arguing that he can perform the essential functions of the CAU position. As we explain in our analysis, the EFL tasks are essential functions of all sworn police officer positions, including those, such as in the CAU, that are typically less demanding than patrol officer positions.

13

employment position are, Congress specifically provided under the ADA that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 USC 12111(8).[10]

The Equal Opportunity Employment Commission (EEOC) regulations provide that the term "essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." 29 CFR 1630.2(n)(1). A function may be essential if, inter alia:

> (i) [t]he reason the position exists is to perform that function; (ii) [there is a] limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) [t]he function [is] highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function. [29 CFR 1630.2(n)(2)(i)-(iii).]

---

[10] This statutory provision, in our judgment, reflects a congressional affirmation of the general right of employers to determine what the essential functions of any particular employment position are.

The EEOC regulations further provide:

Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs. [29 CFR 1630.2(n)(3).][11]

---

[11] As noted, in § 12111(8) of the ADA, the Congress has specifically provided that "consideration shall be given to an employer's judgment as to what functions of a job are essential . . . ." The statute is silent, however, regarding what constitutes "consideration" in accordance with § 12111(8). In *Yellow Transp Inc v Michigan,* 537 US 36, 45; 123 S Ct 371; 154 L Ed 2d 377 (2002), the United States Supreme Court held that "[i]f a statute is ... 'silent or ambiguous with respect to [a] specific issue,' [courts] must sustain the agency's interpretation if it is 'based on a permissible construction of the statute.'" Regarding this issue, the EEOC has concluded that, to afford the employer's judgment adequate "consideration," it is sufficient to include the "employer's judgment" in its § 1630.2(n)(3) listing of factors to consider in determining whether a job function is essential. While we accept that this construction of "consideration" is not altogether unreasonable, and is therefore "permissible," we do not necessarily think that it is the best or the most reasonable construction of the law. In our estimation, § 1630.2(n)(3)—by seemingly providing that the employer's judgment is to be accorded the same weight as any other factors—risks diluting any real significance of the Congress's specific, and exclusive, statutory directive that consideration is to be given to the employer's judgment. Nonetheless, in accordance with *Yellow Transp,* we accord deference to the EEOC regulations and apply them

15

Because the plaintiff bears the overall burden of demonstrating under the ADA that he is a "qualified individual with a disability," the burden of proving that a challenged function is not "essential" lies with the plaintiff. See *Laurin v Providence Hosp*, 150 F3d 52 (CA 1, 1998). Further, a contrary position would be at odds with § 12111(8), which requires that "consideration shall be given to the employer's judgment as to what functions of a job are essential . . . ." We find compelling the court's analysis of this issue in *Hamlin v Charter Twp of Flint*, 942 F Supp 1129, 1138 (ED Mich, 1996), in which Judge Rosen stated succinctly:

> Pretty clearly, placing the burden on the employer to show a certain job function is essential would place courts and jurors in the position of second-guessing an employer's business judgment as to what the essential functions of a job are, without even requiring the plaintiff challenging the function to first come forward with evidence that the function is not essential.[12]

to the extent they are relevant to our analysis of the ADA.

[12] The United States District Court for the Eastern District of Michigan, unlike this Court, is bound by decisions of the United States Court of Appeals for the Sixth Circuit. Thus, although the district court in *Hamlin* believed that the burden to prove that a disputed function is not essential belonged with the plaintiff, it was nonetheless required, in accordance with contrary Sixth Circuit precedent, to place this burden on the defendant. *Id.*, citing *Monette v Electronic Data Sys Corp,* 90 F3d 1173 (CA 6, 1996). Despite the dissent's contrary statement, we

16

In analyzing whether the EFL tasks are "essential" to plaintiff's former position, the EEOC regulations suggest that courts must undertake a factual analysis of the relevant factors. The dominant consideration in this factual analysis is that plaintiff was a police officer. A police officer is a member of a profession charged with carrying out what arguably constitute primary functions of government, protecting the citizenry from criminals and preserving "domestic tranquility." A police officer performs functions that are indispensable to our free and ordered society. In Michigan, a police officer is "responsible for the prevention and detection of crime and the enforcement of the general criminal laws of this state." MCL 28.602(k)(i). A police officer is a member of a highly regulated profession, subject to a broad range of municipal and state rules and policies, not to mention the constraints of the federal and state constitutions. Each of these regulations is designed to ensure that a police officer performs the functions of his position within the boundaries of public policy. When the police officer acts outside these boundaries, adverse consequences may be

do not "disregard" the conclusion reached by the Sixth Circuit in *Monette.* We simply find the trial court's reasoning in *Hamlin* to be more persuasive.

17

considerable, including the failure to detect and apprehend criminals, the erosion of the freedoms of citizens, transgressions of the Constitution, and a general undermining of the well-being of society. As a police officer, plaintiff was entrusted with the full measure of the responsibilities of his position.

The statutory law in Michigan further defines the role of a police officer, and provides guidance regarding the essential functions that enable a police officer to perform his duties. MCL 92.2, for example, provides that a city council, such as that of the city of Detroit

> may make and establish rules for the regulation and government of the police, prescribing and defining the powers and duties of policemen and nightwatchmen, and shall prescribe and enforce such police regulations as will most effectually preserve the peace and good order of the city, preserve the inhabitants from personal violence, and protect public and private property from destruction by fire and from unlawful depredation. . . .

Pursuant to these powers, the city of Detroit has given the department the authority to promulgate rules that will enable the department and its officers to effectively maintain the peace in the city. In response, the

department promulgated the EFL.[13]    Because the EFL was formulated in accordance with MCL 92.2 and with the purpose of satisfying the statutory obligations imposed on defendant and its police officers, the defendant's claim that the functions included in that list are "essential" to police officer positions is, in this Court's opinion, highly persuasive.[14]

Further, it is the "duty of all sheriffs, deputy sheriffs, constables, *policemen* and public officers, to arrest and prosecute all persons of whose violation of the [Michigan Penal Code] they may have knowledge or reasonable notice, and for each neglect of such duty, the officer so offending shall be deemed guilty of a misdemeanor."    MCL 750.52 (emphasis added).    MCL 479.13 provides that "every peace officer shall arrest, on sight or upon warrant, any

---

[13] While defendant may not promulgate rules that themselves violate federal law, the only issue in this case is whether the EFL tasks constitute essential functions of the position.   There is no allegation that the EFL tasks are otherwise violative of federal law.

[14] Although the ADA is a federal statute, relevant state statues may be consulted because the ADA does not specifically define what the essential functions of any position are; it provides only that a plaintiff must be able to perform those functions and that the employer's judgment about those functions must be taken into consideration.   State statutes are relevant where, as here,

19

person found violating or having violated, any provision of [the Motor Carrier Act] . . . ." See also MCL 765.26 and MCL 764.1b. Thus, the ability to effect arrests is not only a duty arising from the police officer's general obligation to maintain the peace, but it is a duty specifically imposed on police officers. An officer who neglects to attempt to make an arrest where necessary has committed a criminal offense.

It is apparent that the EFL is a compilation of functions that the department expects an officer will be able to perform so that he may adequately "preserve the peace and good order of the city, preserve the inhabitants from personal violence, and protect public and private property from destruction by fire and from unlawful depredation," MCL 92.2, and thereby satisfy his professional and legal duties.

As noted above, EEOC regulation 29 CFR 1630.2(n)(2)(i) provides that an alleged job function may be essential if "the reason the position exists is to perform the function . . . ." Accordingly, there is no question that the reason cities such as Detroit hire police officers and fund their positions is so that the officers will perform those

_____

they provide evidence supporting the employer's judgment

functions necessary to adequately maintain the peace and enforce the laws of the community.[15] MCL 92.2 grants municipalities the authority to prescribe and enforce police regulations that will most effectively serve these ends, and the department promulgated the EFL pursuant to this authority. Thus, the police officer positions exist specifically for the purpose of performing the very tasks identified in the EFL.

Further, EEOC regulation 29 CFR 1630.2(n)(2)(ii) provides that a function may be essential if there are a "limited number of employees available among whom the performance of that job function can be distributed . . . ." In fact, there is a highly limited number of police officers available among whom the performance of the EFL tasks can be distributed. Because of budgetary constraints, there is a limited number of officers that the department employs to effectively police and patrol the entire city of Detroit, a city of nearly one million people that serves as the center of a metropolitan area of more

---

regarding which functions are essential to the job.

[15] In support of this, MCL 92.1, which grants cities the power to maintain a police force, provides: "The council of any city may provide, by ordinance, for a police force . . . as they may think necessary for the good government of the city and for the protection of the persons and property of the inhabitants . . . ."

than four million people and that functions as an international gateway into the United States.[16]

Additionally, EEOC regulation 29 CFR 1630.2(n)(2)(iii) provides that a function may be essential if it is "highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function."  In fact, because of the nature of the obligations under which police officers labor, the police officer position involves highly specialized responsibilities such that new officers are hired specifically for their ability to perform the EFL tasks.[17] Only a small portion of the overall population would be physically and otherwise equipped to carry out such responsibilities.  Thus, the EEOC regulations at 29 CFR 1630.2(n)(2) lead to the conclusion that the EFL tasks constitute essential functions of a police officer position.

---

[16] US Census 2000, available on-line at <http://www.census.gov> (accessed May 26, 2004).

[17] Pursuant to state law, a police officer candidate must demonstrate the ability to perform tasks similar to those on the department's EFL by passing an approved physical agility examination before he may be employed as a commissioned officer in this state.  See 203 PA 1965, MCL 28.601 *et seq.;* 1979 AC, R 28.4102(h).

As further noted above, EEOC regulation 29 CFR 1630.2(n)(3) provides a nonexhaustive list of factors that may be considered in determining a position's essential functions. The first factor is "[t]he employer's judgment . . . ." Section 1630.2(n)(3)(i). This factor has already been discussed and clearly does not weigh in favor of plaintiff's argument. The second factor, "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job," § 1630.2(n)(3)(ii), is not relevant in this case because neither side has presented evidence relating to any job description prepared *before* plaintiff was hired. However, because the written job description currently used by the department includes the EFL tasks, and because, at least since 1975, the department has maintained a written job description that includes many tasks similar to those on the EFL, this factor too does not appear to weigh in plaintiff's favor. Another EEOC factor is "[t]he consequences of not requiring the incumbent to perform the function . . . ." Section 1630.2(n)(3)(iv). If defendant, rather than plaintiff, is correct in its assessment of the necessary functions of the police officer position, then the consequences of siding with the plaintiff would potentially exact a considerable cost on the ability of defendant to carry out its responsibilities.

23

As earlier noted, the duties of the police officer position are essential to carrying out what is arguably the primary function of government, protecting the citizenry from criminals and preserving "domestic tranquility." Thus, this factor likewise does not weigh in plaintiff's favor. Another EEOC factor refers to the "terms of a collective bargaining agreement [CBA] . . . ." Section 1630.2(n)(3)(v). Plaintiff notes that there is nothing in the CBA that prevents the department from employing individuals with disabilities or making accommodations for these individuals. Although that may be the case, there has been no evidence presented to this Court that a decision by the department to *refrain* from doing so violates the CBA. Thus, this factor also does not weigh in favor of the plaintiff.

This leaves three remaining factors from the EEOC nonexhaustive list to consider, all of which are relied on by plaintiff in support of his case. These are "[t]he amount of time spent on the job performing the function," "[t]he work experience of past incumbents in the job," and "[t]he current work experience of incumbents in similar jobs." Section 1630.2(n)(3)(iii), (vi), (vii). These three factors implicate similar considerations. Plaintiff claims that in his CAU position, he was never called upon

24

to perform the EFL tasks and that other employees in similar positions were likewise not required to perform these tasks.  Thus, plaintiff argues that the EFL tasks are not "essential functions" of his and similar positions. Were this Court to agree with this analysis, we would effectively be eviscerating the CAU and other similar positions of their "police officer" significance.  We decline to do this because the fact remains that these positions are advertised as police officer positions, hired as police officer positions, supervised as police officer positions, governed by laws  pertaining to police officer positions, and subject to the terms and benefits of police officer positions.  Further, such positions are supported by public funds appropriated for the employment of police officers and they must be filled by applicants who satisfy the standards for police officers.  Moreover, to ensure satisfaction of its critical public obligations, the department has determined that all Detroit police officers, including those who need not regularly engage in patrol functions, must be constantly capable of performing those functions during times of riots or crises, or special circumstances, such as the recent electrical blackout or, more predictably, during large special event gatherings, such as the Detroit Thanksgiving Day parade, the Fourth of

25

July fireworks, or major sporting events such as the upcoming Super Bowl. While it may be true that plaintiff, as well as other individual officers, have been rarely called on to perform EFL tasks, this does not obviate the fact that these tasks remain essential to the police officer position.[18]

---

[18] In *Holbrook v Alpharetta,* 112 F3d 1522, 1528 (CA 11, 1997), the United States Court of Appeals for the Eleventh Circuit stated:

> [F]or quite some time . . . the City of Alpharetta was able to accommodate Holbrook with respect to those essential functions he concedes he cannot perform without assistance. It is equally apparent, however, that the City of Alpharetta's previous accommodation may have exceeded that which the law requires. . . . [I]t seems likely that the City retained a productive and highly competent employee based partly on its willingness to make such accommodations. However, we cannot say that the City's decision to cease making those accommodations that pertained to the essential functions of Holbrook's job was violative of the ADA.

Likewise, the fact that the department may have thus far "accommodated" plaintiff by not requiring him to actively perform patrol functions and by allowing him to remain on light duty does not by itself suggest that the EFL tasks are rendered unessential to plaintiff's police officer position or that the department cannot place plaintiff on disability retirement if he is unable to perform those functions. A contrary conclusion would, in fact, inhibit a police department from ever granting any officer a light duty assignment for fear of permanently redefining that officer's essential functions and thereby undermining the flexibility of the department regarding future employment action.

26

Accordingly, under the relevant EEOC standards, there is no genuine question of material fact presented in the record before us that the EFL tasks are essential to plaintiff's former police officer position.[19]  Therefore, we reverse the decision of the Court of Appeals, and reinstate the circuit court's grant of summary disposition on this issue in favor of defendant.  Unless plaintiff can, with or without reasonable accommodation, perform the EFL tasks, his claim under the ADA must be dismissed.[20]

---

[19] In *Laurin, supra* at 58-59, the United States Court of Appeals for the First Circuit noted:

> [Plaintiff] vainly string-cites cases which acknowledge that the . . . "essential function" inquiry [under EEOC regulation § 1630.2(n)(3)] tends to be fact-intensive, such that it is relatively rare that a trial court may enter summary judgment.  Nevertheless, since an ADA plaintiff ultimately must shoulder the burden of establishing that she was able to perform all "essential functions" of her position, at summary judgment [plaintiff]—and not the [defendant-employer]—bore the burden of adducing competent evidence from which a rational factfinder could have found in her favor . . . .   [Citations omitted.]

[20] The dissent argues that, to constitute a basis for dismissal, the alleged essential function must be "uniformly applied in practice to all [officers]." *Post* at 7.  The dissent asserts that the evidence shows that the EFL tasks here are not "uniformly applied in practice to *all* [officers]." *Id*. (emphasis added),  However, if the dissent's reasoning is carried to its inevitable conclusion, it would exclude from the essential functions of the police officer virtually all EFL tasks since few of these, as the dissent itself recognizes, *id*., are

27

### ii. The PWDCRA

The Court of Appeals noted in its opinion that "[t]he ADA's 'qualified' language and the PWDCRA's 'disability' language require essentially the same analysis . . . [and] the result under either statute is the same."[21] We agree that both statutes require *essentially* the same analysis, and in the predominant number of cases, the result under either statute may well be the same. However, because the acts are not identical, and because federal laws and regulations are not binding authority on a Michigan court

"uniformly applied" to "all" officers, including, for example, "all" intake or desk officers. As a result, the dissent would effectively ensure that there is almost no EFL task that would constitute a truly essential function of a police officer position, including that of the "beat cop" who is daily patrolling the streets and on the frontline in protecting the public from criminal offenders. The proper question is not whether a particular task is "uniformly applied" to "all" positions, but only whether it constitutes an essential function of the position at issue. Moreover, the question is not, as the dissent posits, *post* at 8, whether other officers who arguably cannot perform one or more of the EFL tasks should be placed on disability retirement, but rather whether it was appropriate to place *plaintiff* on disability retirement because he cannot perform the essential functions of his police officer position. The practical consequences of the dissent's test would be to accord little respect for the judgment of police departments in determining the qualifications of their officers, and undue regard for the judgment of courts in making this determination. These consequences would be hastened by the dissent's apportionment of the burden of proof upon the police department. See n 12.

[21] Slip op at 3 n 4.

28

interpreting a Michigan statute, we caution against simply assuming that the PWDCRA analysis will invariably parallel that of the ADA.[22]

Unlike the ADA, the PWDCRA does not provide specific guidance regarding what the *duties of a particular job* are. Thus, the task falls upon the judiciary to determine how to resolve relevant disputes in the absence of a more specific legislative directive. In doing this, we take into account a number of considerations. First, we take cognizance of the obvious fact that there is statutory silence on this matter in the PWDCRA and that something more than silence is required, in our judgment, to warrant redefining the role of the employer in determining the scope of job positions within its purview. That is, there is no indication anywhere in the PWDCRA that the employer's customary responsibilities in this regard were to be

_____

[22] In cases filed under both the ADA and the PWDCRA against employers subject to both acts, if an employer is found to have violated the ADA, rarely will it make any practical difference whether the employer has also violated the PWDCRA. However, the PWDCRA covers a broader range of employers than the ADA (while the PWDCRA covers any employer who has one or more employees, the ADA only covers employers who have fifteen or more employees). Thus, small business employers are most likely to be affected exclusively by the PWDCRA. Thus, it is important that courts refrain from glossing over relevant differences

altered by the act, and we decline to read any such indication from the act's silence. Therefore, in the absence of any contrary indication, we believe that the customary responsibilities of the employer in defining the scope of job positions are unaffected by the act and that the judgment of the employer in terms of such scope is entitled to substantial deference by the courts under the PWDCRA.

Second, we take into consideration that the PWDCRA is an *antidiscrimination* statute. It is not a statute designed to regulate, or to set governmental standards for, particular employment positions. Nor is it a statute designed to enable judges to second-guess, or to improve upon, the business judgments of employers. Rather, the PWDCRA's purpose is to ensure that "[t]he opportunity to obtain employment . . . without discrimination because of a disability" is established as a protected civil right. MCL 37.1102(1). In order to avoid transforming the PWDCRA from an antidiscrimination statute into something that is unwarrantedly broader, we believe that the judgment of the employer regarding the duties of a given job position is entitled to substantial deference.

between these two acts and conflating them in a manner

30

Third, our analysis regarding what constitute the "duties of a particular job" is premised on an assumption that the employer is the single most interested person in the world in the success of his business. Therefore, as a general matter, it can reasonably be expected that the functions or duties that the employer specifies for a given position will be those reasonably well-designed to effect the success of such business. It is contrary to the economic interests of a reasonable employer to define a job position in a manner that is either inadequate or irrelevant. While the employer's own judgment about the duties of a job position will not always be dispositive, it is nonetheless always entitled to substantial deference.

Finally, in *Chmielewski* we stated that

> in interpreting provisions of the HCRA [the former PWDCRA], analogous federal precedents are persuasive, although not necessarily binding. . . .
>
> * * *
>
> Because the HCRA definition [of disability] mirrors that of the ADA, we examine federal law for guidance. [*Chmielewski, supra* at 601-604 (citations omitted).]

Accordingly, because the PWDCRA and the ADA are similar in purpose, and generally require similar proofs, we examine the ADA for guidance. The ADA specifically provides that

unwarranted by their language.

31

the employer's judgment regarding what functions of a job are essential shall be given consideration. This is the only such provision in the ADA. As earlier noted, see n 10, it is our judgment that this provision reflects a general congressional affirmation of the right of employers to determine what the essential functions of any particular employment position are. While we do not accept as dispositive in interpreting the PWDCRA the EEOC regulations pertaining to the ADA, see n 11, we do believe that the explicit emphasis set forth in the ADA itself suggests the extent of the deference due the employer's own judgment in determining the duties of a job under the PWDCRA.

Thus, we hold that, in disputes regarding what the duties of a particular job are, the employer's judgment is entitled to substantial deference. Consistent with the plaintiff's burden of proving discrimination under the PWDCRA, the plaintiff bears the burden of presenting sufficient evidence to overcome this deference. Unless the plaintiff can satisfy this burden, it is to be presumed that the employer's judgment concerning the duties of a particular job is reasonable. In such circumstances, the plaintiff must prove that he can, with or without accommodation, perform those duties.

Accordingly, the department's judgment that the EFL tasks are duties of plaintiff's former police officer position is entitled to considerable deference. Plaintiff here has not sustained his burden of demonstrating that the department's judgment in this regard is not reasonable. Thus, we hold that the EFL tasks are "job duties" of a city of Detroit police officer position under the PWDCRA. Therefore, we reverse the Court of Appeals reversal of the circuit court's grant of summary disposition for defendant on this issue. Unless plaintiff can, with or without accommodation, perform these functions, his claim under the PWDCRA must be dismissed.

### D. Ability to Perform Essential Functions

Defendant moved for summary disposition of plaintiff's entire case, arguing that plaintiff is unable to perform the EFL tasks and, therefore, is not entitled to proceed on his ADA and PWDCRA claims. To overcome defendant's motion, plaintiff bears the burden of raising a genuine issue of material fact regarding whether he can perform the EFL tasks. Unless plaintiff can satisfy this burden, summary disposition in defendant's favor is warranted.

In our judgment, the evidence supports summary disposition. After plaintiff suffered a heart attack and was diagnosed with heart disease, his physician released

him to work on restricted duty only. Accordingly, plaintiff spent the majority of his career as a desk clerk.[23] The record indicates that for approximately ten years, there was never a question that plaintiff's heart condition prevented him from performing the full range of duties normally required of police officers. This is precisely why plaintiff's physician placed him on restricted duty and why he remained in a nonpatrol, desk-clerk position for ten years. Plaintiff's own counsel admitted to the trial court that plaintiff, because of his heart condition, cannot perform regular patrol functions.

In attempting to withstand defendant's motion, plaintiff argues that the department failed to undertake an individualized assessment of his condition before placing him on disability retirement in 1995, and, therefore, that a genuine question of material fact necessarily remains regarding whether he can perform the EFL tasks. However, in light of the circumstances of plaintiff's employment history and the nature of his medical condition, we believe

---

[23] Consistent with the decision of the Eleventh Circuit Court of Appeals in *Holbrook*, see n 18, the fact that the department allowed plaintiff for a period of years to continue working, even though he could not perform the essential functions of his position, does not preclude it

that the department was not required to perform an individualized assessment of plaintiff's condition beyond those assessments that were routinely carried out. Department physicians examined plaintiff and consulted the medical records prepared by plaintiff's own physicians. Plaintiff's medical records indicated, as would be expected, that plaintiff's heart condition continued to persist. Under such circumstances, it would be pointless to require the department, before placing plaintiff on disability retirement, to have him undertake agility tests in order to determine whether he could perform the EFL tasks. Such tests would essentially require plaintiff to perform those very tasks that, because of his heart condition, his medical records indicated he was to refrain from performing. When the department stated in 1995 that plaintiff was unable to perform the essential functions of a police officer position, it was relying on evidence that already had been conclusively established by plaintiff's own medical records and accepted as the truth by all parties.

Plaintiff has presented evidence that he chased down a purse-snatcher on foot approximately fifteen years ago.

_____

from subsequently changing its mind, perhaps on the basis

35

This evidence perhaps demonstrates that plaintiff is not incapable of performing on a sporadic basis individual EFL tasks. However, in light of the substantial contrary evidence reflected in plaintiff's medical records and by ten years of employment history, that evidence does not create a genuine question of material fact regarding whether plaintiff is capable of performing the essential functions of a police officer.

Accordingly, in light of the evidence in support of summary disposition, the evidence presented by plaintiff does not raise a genuine question of material fact. Because the record establishes that plaintiff is unable to perform the EFL tasks, he may not proceed on his ADA and PWDCRA claims. We therefore reverse the decision of the Court of Appeals and reinstate the circuit court's grant of summary disposition in favor of defendant.

## V. CONCLUSION

In conclusion, plaintiff has raised no genuine issue of material fact regarding whether the EFL tasks are "essential functions" of his former police officer position. Therefore, we reverse the decision of the Court of Appeals on this question, and we reinstate the circuit

---

of budgetary or other considerations.

court's grant of summary disposition in favor of defendant.

We further hold that plaintiff has not raised a genuine issue of material fact regarding whether he is able to perform the essential functions of a police officer position.  Therefore, we reverse the decision of the Court of Appeals on this question as well. We reinstate the circuit court's grant of summary disposition in favor of defendant.

> Stephen J. Markman
> Maura D. Corrigan
> Clifford W. Taylor
> Robert P. Young, Jr.

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

ALLAN PEDEN,

    Plaintiff-Appellee,

v                                    No. 119408

CITY OF DETROIT, DETROIT
POLICE DEPARTMENT,

    Defendant-Appellant.

_____

KELLY, J. (*dissenting*).

    While I agree with much of the majority's analysis, I cannot join in its decision to uphold the trial court's summary dismissal of this case.  Instead, I would affirm the decision of the Court of Appeals, reverse the trial court's ruling, and remand the matter for trial.

    The issue is not whether defendant has the right to require all its officers to meet what it determines are essential functions of police work within the department. It is whether plaintiff presented a factual question about whether the requirements that defendant has designated as essential for its police officers are actually imposed on all officers.

THE APPROPRIATE STANDARD OF REVIEW

The appropriate standard of review for this case is recited in *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999):

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. MCR 2.116(C)(10), (G)(4). *Quinto v Cross & Peters Co*, 451 Mich 358; 547 NW2d 314 (1996).

THE SIGNIFICANCE OF THE EEOC INTERPRETIVE GUIDELINES

The majority describes the statutory framework of the Americans With Disabilities Act (ADA), 42 USC 12101 *et seq.*, and the Michigan Persons With Disabilities Civil Rights Act, MCL 37.1101 *et seq.* It disregards the Interpretive Guidelines promulgated by the Equal Employment Opportunity Commission (EEOC). These guidelines are valuable in clarifying that the "essential functions" of a police officer must be essential in reality, not just on paper:

> The inquiry into whether a particular function is essential initially focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential. For example, an

2

employer may state that typing is an essential function of a position. If, in fact, the employer has never required any employee in that particular position to type, this will be evidence that typing is not actually an essential function of the position.

* * *

It is important to note that the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards. (See § 1630.10 Qualification Standards, Tests and Other Selection Criteria). If an employer requires its typists to be able to accurately type 75 words per minute, it will not be called upon to explain why an inaccurate work product, or a typing speed of 65 words per minute, would not be adequate. Similarly, if a hotel requires its service workers to thoroughly clean 16 rooms per day, it will not have to explain why it requires thorough cleaning, or why it chose a 16 room rather than a 10 room requirement. *However, if an employer does require accurate 75 word per minute typing or the thorough cleaning of 16 rooms, it will have to show that it actually imposes such requirements on its employees in fact, and not simply on paper.* [29 CFR Pt 1630, App 1630.2(n) (emphasis added).]

The EEOC Interpretive Guidelines render the question of what comprises the essential functions of a job a factual matter. In addition, the language cited suggests that it is the employer who must show that the purported "essential functions" of a job are imposed uniformly.

THE APPROPRIATE BURDEN OF PROOF

With respect to which party bears the burden of proving the essential nature of the disputed "essential

3

functions," the majority finds persuasive the analysis of a federal district court. It disregards rulings by the United States Court of Appeals for the Sixth Circuit that the burden is on the employer. See *Monette v Electronic Data Sys Corp*, 90 F3d 1173, 1179-1180, 1184-1185 (CA 6, 1996), and *Hamlin v Charter Twp of Flint*, 165 F3d 426, 429-431 (CA 6, 1999). I find the Sixth Circuit analysis more soundly grounded in the EEOC's Interpretive Guidelines and more compelling.

## A CASE-BY-CASE ANALYSIS IS REQUIRED

In formulating its opinion, the majority considers the job requirements *for* a department's police officers in general terms. The consideration should be focused, instead, case by case, on the essential functions of an officer in the plaintiff's position. Other courts reviewing ADA claims against law enforcement agencies have taken the latter approach.

For example, in *Champ v Baltimore Co*,[1] the plaintiff did not prevail because the defendant showed that he could not perform essential duties that actually were required of all officers. Plaintiff had lost the complete use of one arm and could not drive a vehicle under emergency conditions or effectuate a forcible arrest. He was not

4

proficient with a firearm. The department provided evidence that all officers were subject to reassignment at any time and that nonpatrol officers actually were reassigned to patrol in emergencies.

Similarly, in *Shoemaker v Pennsylvania Human Relations Comm,*[2] the court considered the small size of the police department and the actual duties of its officers in determining that all officers were required to perform patrol work. Plaintiff could not do that work.

In *Dorris v Kentwood,*[3] a Michigan federal district court refused to grant summary disposition in favor of the defendant police department. There, the officer offered evidence that his position as an in-school instructor did not require the strenuous physical exertion demanded of a patrol officer. In each of the cases, the department was obligated to come forward with evidence that in practice all of its officers were required to perform the activities that it demanded of the plaintiff.

The proper factual analysis is set forth at 29 CFR pt 1630.2(n). The trial court in this case failed to engage

_____

[1] 884 F Supp 991 (1995).

[2] 160 Pa Cmwlth 216; 634 A2d 772 (1993).

[3] 1994 US Dist LEXIS 15640; 1994 WL 762219, 4 Am Disabilities Cas (BNA) 741 (WD Mich, 1994).

5

in that analysis. Rather, it decided that public policy considerations required that defendant be insulated from judicial review of the "essential functions" that it had established for its officers. It ignored that plaintiff has raised a question of fact regarding whether those functions were uniformly applied to all officers.

THE ESSENTIAL FUNCTIONS MAY NOT HAVE

BEEN UNIFORMLY APPLIED IN PRACTICE

In this case, for ten years after plaintiff's physician placed him on restrictive duty status, he worked for defendant, a large, urban police department that was divided into many subdivisions. Eventually, he successfully bid for both A-clerk and Crime Analysis Unit (CAU) positions. He won these positions without regard to his medical condition. Neither required the physical capabilities of a patrol officer. After plaintiff had served three years in the CAU, defendant forced him into involuntary disability retirement.

Defendant asserts that plaintiff was unable to perform the essential functions of his job. As evidence of its definition of essential functions, defendant relies on a Michigan Law Enforcement Officer Training Commission list that it had adopted. See *ante,* p 3. However, plaintiff provided testimony that full-duty officers were not routinely evaluated to determine whether they could perform

6

all the tasks on the list. Further evidence demonstrated that defendant continued to employ others, including a wheelchair-bound officer, who also could not perform all the tasks on the essential functions list.

There is precedent for adopting plaintiff's position that, to establish grounds for dismissal, essential functions must be uniformly applied in practice to all. The court in the case of *Simon v St Louis Co, Mo,*[4] faced a situation similar to the instant one. After the plaintiff's dismissal, other disabled officers remained at work as commissioned police officers. The United States Court of Appeals for the Eighth Circuit remanded the case to the district court with the following order:

> On remand, the district court should consider whether the requirements for police officers of St. Louis County, as testified to at trial by Colonel Kleinknecht, are reasonable, legitimate, and necessary requirements for all positions within the department. The district court should determine whether the ability to make a forceful arrest and the ability to perform all of the duties of all of the positions within the department are in fact uniformly required of all officers. If not uniformly required, they should not be considered actual requirements for all positions. [*Id.* at 321.]

In *Simon*, the plaintiff police officer presented evidence that the defendant police department's physical

---

[4] 656 F2d 316, 320 (CA 8, 1981).

7

requirements for officers were not actually applied to all officers. This case is similar to *Simon* in that Officer Peden presented evidence that the department's essential functions were not, in fact, required of all but were selectively required.

Contrary to the majority's characterization, I do not imply that every officer must spend the same percentage of time on every task on the essential functions list. Rather, if all the tasks are applicable to all the officers, as the police department asserts, then all tasks must actually be considered when assessing the ability of any officer. If one officer is subject to forced disability retirement because he cannot perform an essential function, then all officers who cannot perform that function should be forced to retire.

The difficulty that plaintiff raises here is that, although the department asserts that all officers must satisfy all tasks on the list, that assertion may not be true in practice. In accordance with the EEOC Interpretive Guidelines, we should not defer to an essential function if it is essential only on paper. Given that plaintiff has offered evidence that officers who cannot perform the essential functions are still employed by the department, summary disposition should not have been granted.

8

CONCLUSION

I agree with the majority that the courts should give deference to the descriptions given by police departments of the essential functions of their officers' jobs. However, I do not believe that the deference should be absolute.

To constitute a basis for dismissal, the essential functions must be uniformly applied to all police officers. The burden is on the department, if challenged, to make this showing. In this case, plaintiff raises the issue whether defendant viewed the tasks on its essential functions list as applicable to all positions within the police department and uniformly required them.

Consequently, summary dismissal of plaintiff's claim was not appropriate. While it is unknown whether plaintiff would prevail at trial, he has provided enough evidence to escape summary disposition. I would affirm the decision of the Court of Appeals and remand the case for trial.

Marilyn Kelly
Michael F. Cavanagh
Elizabeth A. Weaver

9