# STATE OF MICHIGAN

# COURT OF APPEALS

MARK ALAN MILLER,

        Plaintiff-Appellee,

v

MICHIGAN STATE POLICE,

        Defendant-Appellant,

and

MONICA YESH, ANN MCCAFFERY, SHEILA
SHIELDS, ROBERT T. WOLFORD, KAREN
SUNIGA, STEPHANIE HORTON, CATHY
HOWELL, HEATHER WYATT, YORK RISK
SERVICES GROUP, INC., LINDA K.
FORSBERG, PH.D, and PSYBUS, P.C.,

        Defendants.

UNPUBLISHED
July 18, 2017

No.   331406
Wayne Circuit Court
LC No.   14-008094-CZ

Before:  MURPHY, P.J., TALBOT , C.J., and O'CONNELL, J.

PER CURIAM.

Defendant Michigan State Police (MSP) appeals by leave granted[1] an order denying its motion for summary disposition.  Among other arguments, MSP contends that it was entitled to summary disposition in this employment discrimination action brought under the Persons with Disabilities Civil Rights Act (PWDCRA), MCL 37.1101 *et seq.*, because plaintiff Mark Miller was unable to demonstrate that he was "disabled" for purposes of the PWDCRA.  Because we agree that Miller did not satisfy his initial burden of demonstrating that his actual mental conditions or perceived mental impairment satisfied the definition of disability set forth in the PWDCRA, we reverse and remand for entry of summary disposition in favor of MSP.

---

[1] *Miller v Yesh*, unpublished order of the Court of Appeals, entered June 2, 2016 (Docket No. 331406).

-1-

This matter arises from Miller's former employment with MSP as a state trooper. The actions taken against Miller were precipitated by events that occurred during a traffic stop he conducted on May 19, 2013. After initiating the stop directly in front of MSP's Cadillac Place post in the city of Detroit, it quickly became apparent to Miller that the female driver, Doreen Bey, was in the midst of a domestic dispute with a pedestrian standing across the street, who was later identified as Shannon Sanders. The two continued to shout at one another, and Miller was eventually forced to restrain both individuals. Miller placed Sanders in handcuffs and called for backup as he physically controlled Bey. As these events unfolded, two onlookers stopped nearby to watch the encounter. Miller told the onlookers to leave but had his attention focused on Bey.

Several people responded to Miller's request for backup, including three troopers dressed in civilian clothing and Miller's supervisor, Sergeant Sheila Shields. Bey was arrested and escorted into the MSP post. As Shields was conversing with Sanders, Miller once again instructed the onlookers to leave the scene, to no avail. After the female onlooker refused to show Miller her identification, Miller led her into the MSP post. He returned outside and began the same procedure with the male onlooker. However, before Miller could take the man inside, Shields intervened and instructed Miller to let the man go. Miller complied and briefly discussed the situation with Shields before leaving his badge on the hood of his patrol vehicle and entering the MSP post. Once inside, he placed his guns and ammunition on Shields's desk, changed into civilian clothes, and left.

The parties offered contrasting descriptions of the nature of Miller's conduct and attitude during the encounter. Based on Shields's recollection, MSP averred that Miller was highly agitated when he confronted the second onlooker and was physically aggressive toward the man. In a memorandum regarding the incident, Shields wrote:

> I then began to talk to Tpr. Miller telling him that he needed to calm down, that he was out of control. The arrest of [Bey] was good but he can't arrest everybody for just being in the area. Tpr. Miller continued to yell that this was just b******t and he was sick of MSP. . . . I continued to try and deescalate the situation, to no avail. Tpr. Miller said, "he had had enough and was sick of all the MSP b******t". [sic] As he was saying this he took off his badge from his uniform and flung it on the hood of his patrol vehicle. I kept telling him that this was ridiculous and he needed to calm down and regain control. Tpr. Miller went off heading for the detachment saying, "he didn't need this. He was through with it."

By contrast, Miller's description of his own conduct reflected a calm and controlled demeanor. He characterized the onlookers as "hecklers" and said he asked them to leave because unnecessary crowds can pose safety risks during an arrest. Miller denied that he acted violently toward the male onlooker, testifying that he gently led the man by the arm toward the MSP post. Miller conceded that he abandoned his badge and other gear during the incident, but explained that he felt humiliated because Shields had belittled him in front of other troopers and citizens. He clarified that he did not attempt to quit when he left the post; rather, it was the end of his shift and he did not intend to return until he spoke with Lieutenant Ann McCaffery the next day.

After meeting with MSP's chief police psychologist, Dr. Robert Wolford, Miller was initially placed on medical leave, without objection. However, on June 25, 2013, MSP's human

resources director placed Miller on administrative leave pending his completion of a fitness for duty evaluation (FFDE). Dr. Wolford also opined that an FFDE was warranted and referred Miller to Dr. Linda Forsberg for the evaluation. On the referral form, Dr. Wolford stated that Miller lost his professional demeanor during a traffic stop and noted "evidence of elevated anxiety, poor impulse control, emotional reactivity, resistance to orders, and use of poor judgment." While the FFDE was being arranged, Miller's treating psychiatrist, Dr. Raad Jajo, M.D., wrote a letter to MSP indicating that he had been treating Miller for adjustment disorder with anxiety, depressive syndrome, and attention deficit hyperactivity disorder (ADHD), but that these conditions would not prevent Miller from returning to work. Miller produced similar letters and reports from his other personal healthcare providers and an expert psychiatrist in the months to come.

Dr. Forsberg met with Miller on four occasions, beginning on July 26, 2013. At the conclusion of the evaluation process, Dr. Forsberg provided the following summary and conclusion:

> Mr. Miller is not psychologically fit for duty because he poses a safety risk due to poor judgment, inaccurate reasoning, emotional reactivity, and poor impulse control. He does not now meet the MCOLES [Michigan Commission on Law Enforcement Standards] standard of being "free from mental and emotional instabilities." His inability to report situations in an accurate and logical manner also contributes to his being a safety risk. While Mr. Miller may show a willingness to admit to actions he has taken, he lacks the insight into why his actions were inappropriate. Hence, he is likely to demonstrate repeated poor decision making since a large part of police work is about making sound independent decisions and demonstrating good discretionary judgment in addition to "following orders."

> It is recommended that he be off work for an additional six months with the goal of achieving a constant plateau of mental stability. At such time, he should be reevaluated for psychological fitness for duty as a State of Michigan State Trooper as a condition of his returning to work. At that time, complete documentation of treatment will be requested from his treating psychiatrist.

> Based on the evaluation procedures outlined in this report, it is this examiner's professional opinion that Mr. Miller is not psychologically fit at this time to perform the essential job functions of a Michigan State Police Trooper.

As a result of Dr. Forsberg's determination that he was unfit for duty, Miller became "ineligible to remain on administrative leave but was allowed to utilize sick leave and to apply for long-term disability benefits."

At some point after the May 19, 2013 incident, several MSP employees of varying rank expressed concerns to McCaffery that Miller might engage in workplace violence. Given these concerns, McCaffery issued a written notice to squad sergeants at six detachments instructing them that Miller was restricted from entering the "Metro Post or its detachment offices, with the

exception of Second District Headquarters." McCaffery also provided a photograph of Miller to at least one commander who was unfamiliar him.

Miller initiated the instant action in the Wayne Circuit Court on June 24, 2014, alleging that MSP discriminated against him on the basis of his depression, anxiety, and ADHD, or other perceived disabilities. MSP moved for summary disposition and the trial court denied its motion, reasoning that the conflicting opinions of the parties' experts created a question of fact regarding Miller's fitness for duty. This appeal followed.

We review a trial court's ruling regarding summary disposition de novo.[2] When a party moves for summary disposition pursuant to MCR 2.116(C)(10),[3] its motion should be granted "if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law."[4] "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ."[5] When the nonmoving party has the ultimate burden of proof at trial, the moving party can satisfy its burden of production under MCR 2.116(C)(10) by " 'submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim,' or by 'demonstrat[ing] to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.' "[6] If the nonmoving party fails to produce evidence sufficient to demonstrate an essential element of its claim, the moving party is entitled to summary disposition.[7]

With respect to employment rights, the PWDCRA provides that an employer shall not "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position."[8] To establish a prima facie case of discrimination under the statute, a plaintiff must show that (1) he is "disabled" as defined by the statute, (2) the disability is unrelated to the plaintiff's ability to

---

[2] *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

[3] MSP sought summary disposition in the lower court under MCR 2.116(C)(8), which tests the legal sufficiency of the pleadings, and MCR 2.116(C)(10), which tests the factual sufficiency of the opposing party's claim. *Nuculovic v Hill*, 287 Mich App 58, 61; 783 NW2d 124 (2010). However, because the parties relied on documentary evidence beyond the pleadings, we will review MSP's claim of error under the standards applicable to a motion made under MCR 2.116(C)(10). *Id.*

[4] *West*, 469 Mich at 183.

[5] *Id.*

[6] *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 7; 890 NW2d 344 (2016), quoting *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996) (alteration in original).

[7] *Lowrey*, 500 Mich at 9.

[8] MCL 37.1202(1)(b).

-4-

perform the duties of a particular job, and (3) the plaintiff has been discriminated against in one of the ways set forth in the statute.[9] Before a court can consider the second and third elements, the plaintiff bears the burden of establishing that he is a person with a "disability" entitled to protection under the PWDCRA.[10] When reviewing PWDCRA claims, Michigan courts view federal precedent concerning analogous antidiscrimination statutes, like the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*., as persuasive.[11]

In pertinent part, MSP argues that the trial court erred by denying its motion for summary disposition because Miller failed to establish that he is disabled within the meaning of the PWDCRA. We agree. In the context of employment discrimination, the PWDCRA uses the term "disability" to refer to one or more of the following:

> (*i*) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:

> (A) . . . [S]ubstantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

> \* \* \*

> (*iii*) Being regarded as having a determinable physical or mental characteristic described in subparagraph (*i*).[12]

Thus, not every impairment constitutes a "disability" under the PWDCRA. Instead, the plaintiff's actual or perceived physical or mental characteristic must be one that "substantially limit[s] a major life activity," but does not "prevent the disabled individual from performing the duties of a particular job."[13]

Miller presented evidence that he suffers from three mental health conditions—depression, anxiety, and ADHD. MSP does not seem to dispute Miller's diagnoses. Instead, it argues that Miller did not adequately demonstrate that any of these conditions substantially limited a major life activity. Surprisingly, Miller makes no attempt to argue that he is substantially limited by depression or anxiety, let alone offer evidence in support of that position.

---

[9] *Peden v City of Detroit*, 470 Mich 195, 204; 680 NW2d 857 (2004) (citation omitted).

[10] *Chiles v Machine Shop, Inc*, 238 Mich App 462, 473; 606 NW2d 398 (1999).

[11] *Id*. at 472-473.

[12] MCL 37.1103(d).

[13] *Peden*, 470 Mich at 204.

Instead, he limits his argument to the effect of his ADHD, which he contends substantially limits his ability to think and concentrate.

The plain language of the statute mandates that in order for a physical or mental condition to qualify as a disability for purposes of the PWDCRA, it must *substantially* limit a major life activity.[14] "To determine whether an individual is substantially limited, a court considers (i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment, and (iii) the permanent or expected permanent or long-term effect."[15] Additionally, the plaintiff's condition should be considered as it exists with the benefit of medication.[16] In support of his contention that his ADHD substantially limited his ability to think and concentrate, Miller relied on a medical report from his former psychologist, Dr. John George, Ph.D., which describes "noteworthy attention deficit issues" and reiterates complaints from Miller's wife that might be attributable to his ADHD. However, this report undermines Miller's argument, as Dr. George's ultimate diagnostic impression of Miller's attention deficit condition was that Miller suffered from *moderate* ADHD symptoms. Moreover, letters from Miller's treating psychiatrist and physicians indicated that Miller's condition was controlled with medication.[17] Dr. Jajo expressed a similar opinion in his deposition. Thus, the evidence presented does not create a genuine issue of fact as to whether Miller was actually disabled within the meaning of the PWDCRA because it does not show that Miller's ADHD *substantially* limited at major life activity.

Miller also alleged that he was discriminated against on the basis of a perceived disability. A plaintiff pressing a claim of employment discrimination arising from a perceived disability must prove that the defendant regarded him as being actually disabled within the meaning of the PWDCRA.[18] Thus, in order to prevail on this theory, Miller was required to demonstrate that he is a member of the protected class by offering proof that

> (1) [he] was regarded as having a determinable physical or mental characteristic;
> (2) the perceived characteristic was regarded as substantially limiting one or more of [his] major life activities; and (3) the perceived characteristic was regarded as being unrelated either to [his] ability to perform the duties of a particular job or position or to [his] qualifications for employment or promotion.[19]

---

[14] *Chiles*, 238 Mich App at 479.

[15] *Id*.

[16] *Chmielewski v Xermac, Inc*, 457 Mich 593, 606; 580 NW2d 817 (1998).

[17] Although Miller argues that this Court should not consider the effect of his medication because MSP did not present that argument in the lower court, this position must fail because Miller himself raised a cursory argument regarding the effect of his medication, thereby placing the issue before the trial court.

[18] *Chiles*, 238 Mich App at 475.

[19] *Michalski v Bar-Levav*, 463 Mich 723, 732; 625 NW2d 754 (2001).

A perceived disability is typically "one that pertains to a disability with some kind of unusual stigma attached, often a mental disability, where negative perceptions are more likely to influence the actions of an employer."[20] Dr. Forsberg explained that law enforcement officers are referred for FFDEs to determine if a psychological or mental impairment is underlying or contributing to difficulties at work. Thus, the very fact that Miller was referred for an FFDE suggests that, at minimum, MSP was concerned that he may be suffering from some sort of impairment. MSP's concerns were seemingly confirmed by Dr. Forsberg's conclusion that Miller was not "free from mental and emotional instabilities." Although Miller contends that Dr. Forsberg used an inapplicable standard in the FFDE, MSP's later reliance on Dr. Forsberg's evaluation clearly demonstrates that it *perceived* Miller as suffering from a mental instability.

Nonetheless, Miller's perceived disability claim must fail for other reasons. Most importantly, it is clear that MSP regarded Miller's condition as being related to his ability to perform the functions of a state trooper. It goes without saying that the essential duties of any law enforcement officer include the ability to react appropriately and maintain composure in stressful situations. Miller was referred for an FFDE because MSP believed he displayed "poor impulse control, emotional reactivity, . . . and use of poor judgment," during the May 19, 2013 traffic stop and earlier incidents. Dr. Forsberg relied on these same factors in concluding that Miller posed a safety risk and was, therefore, psychologically unfit for duty. In other words, MSP refused to allow Miller to return to work based on Dr. Forsberg's opinion that his mental state rendered him unfit to perform the essential functions of a state trooper.

With respect to the substantial limitation requirement, Miller contends that MSP perceived his mental condition as substantially limiting the major life activity of working. According to Miller, MSP's act of distributing his photograph to various detachments with a warning that he might engage in workplace violence demonstrated that it believed he was incapable of performing a wide variety of jobs because such behavior would be unacceptable in any employment setting. However, even if this Court agreed with Miller's argument in the context of the substantial limitation requirement, Miller's position implicitly acknowledges that MSP perceived his mental condition as related to his qualification for employment. "[O]ne of the duties of any job is to work safely: employees owe a general duty to their employers to act with due regard for the safety of themselves and others while at work."[21] Thus, to the extent that MSP perceived Miller as posing a threat to the safety of its employees because of his mental condition, the PWDCRA did not require that MSP refrain from taking adverse action against him. As aptly explained by a federal court construing a similar limitation applicable to the ADA,

---

[20] *Chiles*, 238 Mich App at 475.

[21] *Szymczak v American Seating Co*, 204 Mich App 255, 257; 514 NW2d 251 (1994). See also *Collins v Blue Cross Blue Shield of Mich*, 228 Mich App 560; 579 NW2d 435 (1998) (finding that the plaintiff was not protected from termination under the Handicappers' Civil Rights Act, former MCL 37.1101 *et seq.*, when she was discharged after expressing homicidal ideation regarding her supervisor during therapy).

The Act does not require an employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge—in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone.[22]

Because Miller did not establish that he is a person to whom the PWDCRA should apply—i.e., a person with a "disability"—the trial court erred by considering whether the evidence presented created a material question of fact with respect to other aspects of Miller's employment discrimination claims.

Reversed and remanded for entry of summary disposition in favor of MSP. We do not retain jurisdiction.

/s/ William B. Murphy
/s/ Michael J. Talbot
/s/ Peter D. O'Connell

---

[22] *Palmer v Circuit Court of Cook Co, Ill*, 117 F3d 351, 352 (CA 7, 1997).