*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RANDY K. JEWETT,

        Plaintiff-Appellant,

v

MESICK CONSOLIDATED SCHOOL DISTRICT,

        Defendant-Appellee.

FOR PUBLICATION
June 4, 2020
9:05 a.m.

No. 348407
Wexford Circuit Court
LC No. 2018-027883-CD

Before: RONAYNE KRAUSE, P.J., and SERVITTO and REDFORD, JJ.

RONAYNE KRAUSE, P.J.

In this employment discrimination action brought under the Persons with Disabilities Civil Rights Act (PWDCRA), MCL 37.1101 *et seq*., plaintiff, Randy K. Jewett, appeals by right the trial court's order granting defendant's motion for summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact). We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff was hired in 1992 by defendant, the Mesick Consolidated School District (the School), as a custodian. According to a psychological evaluation, plaintiff suffers from attention deficit hyperactivity disorder (ADHD), an unspecified anxiety disorder, a "reading disorder," and a "disorder of written expression." Plaintiff contends that he also suffers from dyslexia and hypoglycemia. It is not seriously disputed that plaintiff is unable to read, although plaintiff contends that he has no difficulty understanding, memorizing, and following verbal directions. Plaintiff was a former special education student at the School, and on that basis, he contends that the School was aware of his disabilities when he was hired. Various School personnel generally agreed that they understood plaintiff to have difficulty reading and possibly ADHD. However, by plaintiff's own admission, he never actually described himself as "disabled;" rather, he only described himself as dyslexic and unable to read.

Throughout the course of plaintiff's employment, his various supervisors and administrators provided plaintiff with verbal instructions regarding his job. Plaintiff was given colored charts of where he was to clean, and laminated photographs of what and how to clean; those visual aids were attached to plaintiff's cleaning cart. At least one superintendent personally

demonstrated to plaintiff how to perform some of his job duties. Plaintiff contends that he understood what he was supposed to do, did what he was supposed to do, and consistently worked to the utmost of his ability. Nevertheless, school personnel complained about the quality of plaintiff's work for many years. Those complaints included leaving floors and bathrooms dirty, failing to follow directions, and attendance problems. Plaintiff's personnel file reflects an extensive history of disciplinary action, and plaintiff admitted that he was disciplined by numerous supervisors or superintendents. Plaintiff nevertheless disputes that there was anything wrong with his work that was not attributable to other causes.[1] Plaintiff contends that he was accommodated until Scott Akom was promoted to superintendent. However, plaintiff admitted that he was never actually denied any requested accommodations, which consisted of asking people to read things to him.

Notably, Akom's predecessor as superintendent, Michael Corey, personally observed plaintiff's work to be substandard, believed plaintiff willfully disregarded instructions and knowingly shirked his duties when he thought no one would know, or performed unacceptable work that plaintiff believed was good enough despite knowing it would not be acceptable to a supervisor. Corey testified that plaintiff's problems followed a reliable pattern of improving for a while after being talked to and plaintiff appearing to understand, only for plaintiff's performance to inevitably fall off again, and "nothing was ever resolved." There is no evidence that Akom interfered with the ongoing practice of giving plaintiff verbal and graphic instructions. As noted, plaintiff could not recall anyone ever saying no to any request he made for accommodation. There is also no evidence that plaintiff's job required him to be able to read.

Plaintiff places great significance on Akom allegedly denying being told by Corey, when the superintendency was transferred, that plaintiff was disabled, which plaintiff claims conflicts with Corey's testimony and shows bias. Plaintiff both misinterprets two comments and takes them out of context. Corey testified that he had discussions with Akom regarding plaintiff when Akom was Corey's subordinate, most of which regarded plaintiff's performance, but "there were some discussions about the source of these performance problems, i.e., his disabilities." Corey did not elaborate. Akom testified only that he *did not recall* Corey telling him that plaintiff had any disabilities, which is completely different from claiming that no such conversation occurred. Akom testified that he was not aware that plaintiff suffered from any disabilities, but he also testified that long before he became superintendent, he was fully aware that plaintiff reported having ADHD and dyslexia. Plaintiff testified that he never told anyone at the School that he was disabled, and in fact other than his hypoglycemia, plaintiff does not claim to have reported any

---

[1] For example, plaintiff described an occasion where he was chastised for failing to wax the floors properly, only for it to be subsequently discovered that the School had received defective floor wax. Plaintiff contended that the reason why there were complaints about bathroom soap dispensers being empty was that the students played with the soap and got it all over the floor. Plaintiff also contended that the floors were not waxed often enough, making it exceedingly difficult to keep them looking shiny.

impediments other than ADHD and an inability to read.[2] Thus, Akom was clearly aware of the substance of plaintiff's alleged disability, and plaintiff simply makes too much of either terminology or a completely normal failure to recall every detail of every conversation from years prior.

Plaintiff contends that he had an acrimonious and oppressive relationship with his supervisor, Robert Harris, and with Ron Barron, who plaintiff regarded as Harris's assistant. Harris did yell at plaintiff on occasion, which he admitted was "not very professional," but when he did, "it would be [plaintiff] not doing his job." Corey testified that he admonished Harris to treat plaintiff with more respect, after which Corey perceived plaintiff's and Harris's relationship to improve. Nevertheless, plaintiff contends that Harris and Barron continued to harass him and make negative and discriminatory comments about him.

In March 2015, plaintiff called in sick to work and was then observed a few hours later at a nearby ski resort.[3] As a consequence of that incident and a list of concerns observed and reported by Tammy Cinco, the interim elementary school principal at the time, Akom imposed upon plaintiff a 10-day unpaid suspension. Plaintiff was also informed that despite his claim at a meeting that he performed his duties every night, it was clear to Akom that plaintiff's duties were not being completed. During that suspension, Akom, along with plaintiff's union president and the assigned Michigan Education Association (MEA) UniServ director,[4] developed a plan to allow plaintiff a non-disciplinary period off work, during which plaintiff could use his vacation, sick, and personal days to seek other income options, including trying to qualify for retirement disability. Plaintiff regarded the offer as a veiled threat that he should quit.

On July 6, 2015, after plaintiff exhausted his leave time, Akom provided plaintiff with a "last chance agreement" at a meeting as the condition of his continued employment. Akom was the only person at that meeting on behalf of the School. The other attendees were plaintiff, plaintiff's cousin, the cousin's wife, and the MEA UniServ director; the latter three were present

---

[2] Plaintiff argues that his psychological evaluation reflected extremely low intelligence that the clinical psychologist described as within the clinical definition of "mental retardation." However, plaintiff oversimplifies: plaintiff scored low on several specific measures, but plaintiff's abilities to understand verbal statements and solve visually presented problems were in the average range. The psychologist opined that plaintiff's "actual cognitive ability is higher than assessed," and that plaintiff was actually of average intelligence, albeit hampered by his difficulties with attentiveness and concentration. In any event, it does not appear that plaintiff ever claimed low intelligence to the School, and his testimony clearly shows that he did not regard himself as intellectually below average and either did or would have disputed any suggestion to the contrary.

[3] Plaintiff explained that he went there because he had no food at his house, he needed to eat something, and a friend offered to buy him a sandwich at the resort.

[4] "UniServ" is the term used by the MEA to refer to field staff assigned to work with local school unions or similar entities representing school employees. <https://www.mea.org/directories/>. The MEA director testified that plaintiff told her only that he was dyslexic, and she did not recall learning of any other impediments or disabilities plaintiff might have had. She also testified that she "read most things" to plaintiff.

to assist plaintiff or represent his interests. The agreement expressly required plaintiff to follow and complete all directives, fully complete his duties and responsibilities, and to be prompt and regular in attendance. The agreement also provided eight additional provisions, which included the fact that he would be immediately terminated if he failed to meet the conditions of the agreement; that he would be closely monitored and must accept that supervision; that he would be expected to report to work at his scheduled time and be prepared to work; and that he "will follow all oral and written policies, procedures, directives, and instructions communicated from administration and/or the supervisor." Plaintiff testified that he understood he could have signed the agreement and was not fired, but he "kn[e]w where it was going." Plaintiff testified that he refused to sign the agreement because he had been working hard and trying to do everything, he did not want to admit to having been negligent at his job, and he believed it was pointless because sooner or later Harris or Barron would "find something." Plaintiff therefore chose to resign rather than sign the agreement.

Plaintiff filed a complaint in circuit court alleging that defendant's actions were in violation of the PWDCRA. Specifically, plaintiff argued that defendant had violated MCL 37.1202(1)(b) (discharge of or discrimination against individual because of disability unrelated to ability to perform job duties). Defendant filed a motion to dismiss under MCR 2.116(C)(10)(no genuine issue of material fact), and the trial court granted defendant's motion. This appeal followed.

## II. STANDARD OF REVIEW

Appellate courts review the trial court's decision on a summary disposition motion de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Appellate courts review the entire record to determine whether summary disposition was warranted. *Id*. A party is entitled to summary disposition under MCR 2.116(C)(10) when the provided evidence does not establish a genuine issue of material fact. *Id*. at 120. The evidence is reviewed in the light most favorable to the nonmoving party. *Id*. "The reviewing court should evaluate a motion for summary disposition under MCR 2.116(C)(10) by considering the substantively admissible evidence actually proffered in opposition to the motion." *Id*. at 121.

## III. APPLICABLE LEGAL PRINCIPLES

The PWDCRA states that the opportunity to obtain employment, without discrimination because of a disability, is a civil right. MCL 37.1102. The Michigan Supreme Court has cautioned that although the analysis under the PWDCRA will often be similar to an analysis under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*., it should not simply be assumed that the PWDCRA will parallel the ADA. *Peden v Detroit*, 470 Mich 195, 217; 680 NW2d 857 (2004). A plaintiff, to prove that a violation of the PWDCRA occurred, must show " '(1) that he is [disabled] as defined in the act, (2) that the [disability] is unrelated to his ability to perform his job duties, and (3) that he has been discriminated against in one of the ways delineated in the statute.' " *Id*. at 204, quoting *Chmielewski v Xermac, Inc*, 457 Mich 593, 602; 580 NW2d 817 (1998) (alterations in original). "[L]ike the ADA, the PWDCRA generally protects only against discrimination based on physical or mental disabilities that substantially limit a major life activity of the disabled individual, but that, with or without accommodation, do not prevent the disabled individual from performing the duties of a particular job." *Peden*, 470 Mich at 204.

Plaintiff argues that he was constructively discharged and that any legitimate business reasons defendant could provide for that discharge are pretextual. "[C]onstructive discharge is not in itself a cause of action," but rather "is a defense against the argument that no suit should lie in a specific case because the plaintiff left the job voluntarily." *Vagts v Perry Drug Stores, Inc*, 204 Mich App 481, 487; 516 NW2d 102 (1994). A constructive discharge occurs when " 'an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation or, stated differently, when working conditions become so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign.' " *Id*., quoting *Mourad v Auto Club Ins Ass'n*, 186 Mich App 715, 721; 465 NW2d 395 (1991). A question of fact exists if reasonable persons could reach different conclusions as to whether these elements were established. *Vagts*, 204 Mich App at 488.

## IV.  ANALYSIS

As an initial matter, although the School does not concede that plaintiff is "disabled" within the meaning of the PWDCRA, there is clearly no serious factual dispute that plaintiff cannot read and has ADHD. Furthermore, notwithstanding plaintiff's arguments about whether anyone at the school knew him to be "disabled," it was clearly common knowledge at all relevant times that plaintiff could not read, or at least could not read well. There is no evidence that plaintiff's inability to read had any real relevance to his job. Significantly, all of the evidence shows that nobody ever refused to read something to plaintiff upon his request, plaintiff never claimed to the School that he was disabled, and plaintiff never requested any other kind of accommodation. Rather, the evidence shows that school personnel took great pains to ensure that plaintiff's job duties were communicated to him verbally, graphically, or demonstratively.

Plaintiff argues that he was constructively discharged because one of the provisions in the last chance agreement required him to follow "all oral *and written* policies…" (emphasis added). However, plaintiff himself testified that the reasons he believed he was being forced out, and the reasons why he refused to sign the agreement, had nothing to do with that provision. Furthermore, as noted, the evidence overwhelmingly shows that if plaintiff ever needed something read to him, someone would read it. In other words, there is no question of material fact that any written policies, directives, procedures, or instructions given to plaintiff would have been read to him aloud on request. Thus, there is simply no basis for concluding that the single line would make plaintiff's working conditions intolerable. *Vagts*, 204 Mich App at 487.[5]

---

[5] Plaintiff relies on *Miles v City of Bay City*, unpublished per curiam opinion of the Court of Appeals, Docket No. 310972, issued May 20, 2014, for the proposition that conditioning a person's continued employment on signing a last chance agreement can constitute an adverse employment action. In *Miles*, the last chance agreement required the plaintiff to waive his union- grievance rights and forbade him to hold any closed- door or one- on- one meetings. This Court concluded that those restrictions "would cause a material loss of benefits" to the plaintiff. In contrast, as noted, plaintiff here chose not to sign the last chance agreement for reasons totally unrelated to the "written policies" line, and in any event, the evidence overwhelmingly shows no plausible danger of anyone failing to read aloud anything plaintiff might need read.

Plaintiff has presented evidence to establish a question of fact whether Harris or Barron disliked plaintiff personally and made his working conditions unnecessarily unpleasant. Plaintiff thus asserts that the so-called "cat's paw" doctrine should apply in this case. Under the "cat's paw" doctrine, discriminatory animus held by a supervisor with no personal decisionmaking authority can be attributed to the employer if the biased supervisor's conduct is nevertheless a proximate cause of the adverse employment action. See *Staub v Proctor Hosp*, 562 US 411, 420-422; 131 S Ct 1186; 179 L Ed 2d 144 (2011). Even if the "cat's paw" doctrine applies in Michigan, it is not relevant here. Akom was adamant that he was the sole decisionmaker. Harris and Barron had no input into Akom's decisions, and in fact, Akom testified that he would have terminated Harris for threatening plaintiff if he knew any such threat occurred. Furthermore, there is no evidence that Harris's and Barron's alleged negativity toward plaintiff was based on plaintiff's inability to read. See *Peden*, 470 Mich at 204. Harris apparently believed plaintiff was not mentally capable of doing his job. Plaintiff's personnel record supports the conclusion that plaintiff was, in fact, not capable of doing his job, for reasons not seemingly related to his inability to read.

In any event, even if plaintiff could demonstrate a genuine issue of material fact regarding whether he was constructively discharged, defendant demonstrated that it had a legitimate business reason to take employment action against plaintiff. If a plaintiff establishes a prima facie case of employment discrimination, the burden shifts to the defendant to articulate a legitimate business reason for the decision. *Aho v Dep't of Corrections*, 263 Mich App 281, 289; 688 NW2d 104 (2004). If a defendant provides a legitimate business reason, then the burden returns to the plaintiff to prove that the reason was a pretext. *Id*. A defendant must produce evidence that its employment actions were taken for a legitimate, nondiscriminatory reason. *Hazle v Ford Motor Co*, 464 Mich 546, 464-465; 628 NW2d 515 (2001). As noted, plaintiff's personnel file and the testimony of multiple school personnel, including Akom's predecessor as superintendent, reflect that plaintiff had an enduring problem of simply failing to do his work while insisting that he was doing his work, and possibly improving temporarily only to inevitably relapse. Plaintiff had an extensive disciplinary history that, sooner or later, would have warranted termination. These facts provide legitimate business reasons for defendant's taking employment action against plaintiff.[6]

An employer's legitimate, nondiscriminatory reasons for firing an employee can be established as pretext "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Major v Village of Newberry*, 316 Mich App 527, 542; 892 NW2d 402 (2016) (quotation omitted). The plaintiff may

---

[6] Plaintiff relies on *Blalock v Metals Trades Inc*, 775 F 2d 703 (CA 6, 1985), for the proposition that we should infer discriminatory motive from the fact that the School stopped tolerating his poor performance, allegedly abruptly, after many years. In *Blalock*, the employer was purportedly happy with the plaintiff's performance until the plaintiff had a falling-out with a religious leader shared by the employer's principals, and thereafter the employer ceased being happy with the plaintiff's performance. The facts here are radically different: plaintiff's personnel file shows that the School had been displeased with plaintiff's performance for many years. The School did not abruptly lower its level of tolerance.

use direct or indirect evidence, but the plaintiff must establish a causal connection between the discriminatory animus and the adverse employment decision. *Id.*

Plaintiff argues that the negative employment decisions culminating in his subjectively-involuntary resignation were pretextual; however, that argument seemingly rests on the above-noted single line in the last chance agreement, Akom's alleged ignorance of plaintiff's disabilities, and the fact that plaintiff was "accommodated" until Akom ascended to the superintendency. As discussed: (1) plaintiff chose to resign for reasons completely unrelated to what the School reasonably characterizes as boilerplate language in the agreement, (2) Akom was in fact fully aware that plaintiff could not read and had ADHD, (3) plaintiff did not describe himself to the School as "disabled" or suffering from any other limitations, (4) the School never refused any request plaintiff made for accommodation, and (5) plaintiff's personnel file and Corey's testimony show that plaintiff already had a long history of work performance and attendance problems that had been addressed with progressive discipline before Akom became superintendent. Plaintiff has not provided any supporting evidence from which it might be deduced that the timing of Akom becoming superintendent and the offer of the last chance agreement was anything other than a mere coincidence. See *West v General Motors Corp*, 469 Mich 177, 186; 665 NW2d 468 (2003) (discussing retaliatory discharge).

Plaintiff maintains that he did in fact perform all of his duties, and he alleged in his complaint that his performance deficiencies were fabricated. A party's own testimony, standing alone, can be sufficient to establish a genuine question of fact. See *Toussant v Blue Cross & Blue Shield of Michigan*, 408 Mich 579, 613; 292 NW2d 880 (1980); *Kenkel v Stanley Works*, 256 Mich App 548, 558-559; 665 NW2d 490 (2003). A conflict in the evidence may generally only be removed from the trier of fact's consideration if it is based on testimony that is essentially impossible or is irreconcilably contradicted by unassailable and objective record evidence. See *People v Lemmon*, 456 Mich 625, 643-646; 576 NW2d 129 (1998); *Scott v Harris*, 550 US 372, 378-381; 127 S Ct 1769; 167 L Ed 2d 686 (2007). Thus, summary disposition is improper where the resolution of a matter turns on the relative credibility of witnesses, even if a party cannot submit documentary proof to refute the opposing party's claims. See *White v Taylor Distributing Co, Inc*, 275 Mich App 615, 624-627; 739 NW2d 132 (2007).

Nevertheless, plaintiff admitted that he was disciplined for performance deficiencies, fairly or not, for much of the course of his employment, including under supervisors and administrators who long predated Akom, Harris, and Barron. As noted, plaintiff was also never denied any accommodation that he requested. There may be a genuine question of fact whether plaintiff's performance issues were real. Unfortunately, however, the personnel file, Corey's testimony, and plaintiff's own testimony show that there is no genuine question of fact that the School *believed* plaintiff's performance issues were real and longstanding. An honest belief, even if ultimately found to be objectively incorrect or improvident, precludes a finding of pretext or bad faith. *Robinson v Hawes*, 56 Mich 135, 139-140; 22 NW 222 (1885); *Town v Michigan Bell Telephone Co*, 455 Mich 688, 703-704; 568 NW2d 64 (1997); see also *Majewski v Automatic Data*

*Processing, Inc*, 274 F 3d 1106, 1116-1117 (CA 6, 2001); *Nizami v Pfizer, Inc*, 107 F Supp 2d 791, 803-804 (ED Mich, 2000).[7]

## V. CONCLUSION

In sum, the School had legitimate reasons for conditioning plaintiff's continued employment on the last-chance agreement, and plaintiff has not established a question of fact that the School's reasoning was pretextual. Although plaintiff has established a question of fact whether Harris and Barron held animosity toward him, plaintiff has not established a question of fact that their animosity had anything to do with his inability to read or that their animosity had any causal connection to Akom conditioning plaintiff's continued employment upon plaintiff signing the last chance agreement.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Deborah A. Servitto
/s/ James Robert Redford

---

[7] This Court is not bound by decisions of lower federal courts, but Michigan courts often regard federal precedent as instructive and persuasive. *Meagher v Wayne State Univ*, 222 Mich App 700, 710; 565 NW2d 401 (1997).