*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BRITTNAY DORSEY,

        Plaintiff-Appellant,

V

TALL BROWN DOG, LLC and WORKBOX
STAFFING, LLC,

        Defendants-Appellees.

UNPUBLISHED
March 26, 2026
12:55 PM

No. 373315
Wayne Circuit Court
LC No. 23-006907-CD

Before: MALDONADO, P.J., and M. J. KELLY and TREBILCOCK, JJ.

PER CURIAM.

Defendant, Workbox Staffing, LLC, fired plaintiff, Brittnay Dorsey, two hours after she informed Workbox that she had not sufficiently recovered from COVID-19 to return from leave as they had originally planned. A jury should determine whether doing so violated the now-repealed COVID-19 Employment Rights Act, MCL 419.401 *et seq.* This is so because no record evidence demonstrates Workbox terminated plaintiff's employment for its asserted performance concerns with her work; indeed, the evidence points in the opposite direction, for the very day before she told Workbox she needed more time to recover, it made plans to move her to a different office to help "coach" her. We vacate the trial court's judgment and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

### A.

We take the facts in the light most favorable to plaintiff as the non-moving party. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019).

Plaintiff worked as a recruiter for Workbox Staffing at its Southgate office. A few months into her employment, in mid-April 2022, she and her infant daughter began not feeling well; both eventually tested positive for COVID-19. Plaintiff informed her manager, Roderick Walker, of her test results on Friday, April 16. Walker responded the following day, advising her that Workbox "will follow the CDC guidelines which states that you will not be contagious 3 days after

a positive test result" and that Workbox would "plan for [her] to return on Tuesday."

That never came to fruition. On the following Monday, plaintiff spoke with Walker and told him that she would not return to work on Tuesday because she still had COVID-19 symptoms: "cough, runny nose, sneeze, the diarrhea, no taste." While she did not have a fever at that point, she was taking Motrin to mitigate her symptoms. Walker told her to inform his regional manager, Caleb Vance, and to note her absence on their shared electronic calendar. Plaintiff followed Walker's directive and contacted Vance, reiterating her inability to return to work based on her ongoing COVID-19 symptoms. Vance advised plaintiff that they would discuss her return to work when she was symptom free. There is no evidence that prior to or during this conversation did Walker, Vance, or any other Workbox employee discuss any performance problems with plaintiff.

As it so happened, later on that same day, Vance discussed the performance of Workbox's recent new hires, including plaintiff. He messaged another manager that "[t]he new hires numbers seem to be coming in well but there's one person who may not check the box on the other non-coachable aspects that we're working on coaching up. She's out sick this week." Vance identified plaintiff as that person and additionally wrote that he "was going to have her work in Ann Arbor when she returns from her covid leave" and that "she can get placements but she's not coachable so the quality is lacking."

Plaintiff still had symptoms on Tuesday, so she asked Walker if she could work from home (as she had done in other instances) or alternatively use paid time off. Walker denied those requests. Vance then followed up with plaintiff, confirming that she could not work from home and that "he was communicating with a higher up and that ultimately [she] would hear from" Walker. Two hours later, Walker called plaintiff and terminated her employment because Workbox "was going in[] another direction." Plaintiff believes she was fired because she "wouldn't come back to work in three days," but admitted she was not so advised; rather, she points to having previously worked from home without issue and her being terminated just a few days after contracting COVID-19.

Other than plaintiff's testimony, the record contains very little concerning Workbox's decision-making process. Neither Walker nor Vance are current Workbox employees. Vance testified that Walker made the decision to terminate plaintiff's employment, and that Walker did so because of "performance and attitude" and that she was "not working out." That testimony is problematic for Workbox as it concerns its motion for summary disposition that is on appeal today, for what Walker said to Vance is inadmissible hearsay that we cannot consider in this procedural posture. See MRE 801(c); MCR 2.116(G)(6). The parties did not depose Walker or submit an affidavit from him. Nor is there any written documentation detailing Workbox's policies for reviewing employee performance, examining plaintiff's status as a 90-day probationary employee as Workbox emphasizes on appeal, or describing her being separated from employment for any reason. And other than Vance's messages discussed above, the only other evidence reflecting her performance is a list of five employees and their "starts" for each month, which Workbox asserts—without any explanation or foundation—demonstrates plaintiff performed lower than her peers.

-2-

B.

Plaintiff filed a one-count complaint against both Workbox and Tall Brown Dog, LLC (which she alleges is a subsidiary of Workbox) on May 31, 2023, just over a year after her termination. She contends defendants violated the then-applicable COVID-19 Employment Rights Act, MCL 419.401 *et seq* (CERA). Following discovery, defendants moved for summary disposition under MCR 2.116(C)(7), (8), and (10), arguing of note that the terms of plaintiff's employment agreement required her to bring any cause of action within six months of her discharge and even if not, that plaintiff's CERA claim was without merit. The trial court agreed on both fronts, concluding both that the shortened-limitations period made this complaint untimely, and that plaintiff could not establish a CERA violation sufficient to submit to the jury. Plaintiff now appeals by right.[1]

## II. COVID-19 EMPLOYMENT RIGHTS ACT

This Court reviews de novo a trial court's grant of summary disposition. See *El-Khalil*, 504 Mich at 159. We agree with plaintiff that there are disputes of material fact concerning the reason for her discharge necessitating a jury trial.

## A. CERA OVERVIEW

Enacted as part of the State's response to the COVID-19 pandemic, CERA imposed certain do-not-report-to-work restrictions on employees. As pertinent here, Section 5 provided:

> An employee who tests positive for COVID-19 must not report to work until they are advised by a health care provider or public health professional that they have completed their isolation period, or all of the following conditions are met:
>
> (a) If the employee has a fever, 24 hours have passed since the fever has stopped without the use of fever-reducing medications.
>
> (b) The isolation period has passed.
>
> (c) The employee's principal symptoms of COVID-19 have improved.
>
> (d) If the employee has been advised by a health care provider or public health professional to remain isolated, the employee is no longer subject to such advisement. [MCL 419.405(1).]

It defined "Isolation period" as "the recommended number of days that an individual be in isolation after the individual first displays the principal symptoms of COVID-19 as prescribed in the United States Centers for Disease Control and Prevention's guidelines regarding COVID-19."

---

[1] Plaintiff's appeal centers exclusively on her claims against Workbox and does not address the trial court's dismissal of her claim against Tall Brown Dog, rendering that claim abandoned. See *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 39, 406; 651 NW2d 756 (2002).

MCL 419.401(h). A "principal symptom" could be defined either by "the director or chief medical executive of the Michigan department of health and human services," or if not so defined, it meant at least a fever, shortness of breath, or uncontrolled cough (if not explained by a known medical or physical condition) or at least two of abdominal pain, diarrhea, loss of taste or smell, muscle aches, severe headache, sore throat, and vomiting. MCL 419.401(j)(*i*) to (*ii*). Section 3 provided that "an employer shall not discharge, discipline or otherwise retaliate against an employee who . . . complies with" CERA's no-work provision set forth in Section 5. MCL 419.403(1)(a). Finally, CERA was short-lived—it was repealed effective July 1, 2023, see 2022 PA 138, a little more than a year after the events at issue today.

## B. FRAMEWORK FOR ANALYZING CERA CLAIMS

For nearly forty years, our Supreme Court has utilized the direct/indirect evidence framework set forth in *McDonnell Douglas v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973), to analyze claims of wrongful termination, see *Matras v Amoco Oil Co*, 424 Mich 675, 683; 385 NW2d 586 (1986). And since, it has applied that familiar rubric to non-Civil Rights Act cases that provide similar workplace protections to employees. See, e.g., *DeBano-Griffin v Lake Co*, 493 Mich 167, 175-176; 828 NW2d 634 (2013) (Whistleblowers' Protection Act); *Peden v Detroit*, 470 Mich 195, 205; 680 NW2d 857 (2004) (Persons with Disabilities Civil Rights Act). As it goes, we must first ask whether a plaintiff has produced direct evidence of unlawful activity, i.e., "evidence which if believed, requires the conclusion that [a] unlawful [reason] was at least a motivating favor in the employer's actions." *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001) (quotation marks and citation omitted). If not, a plaintiff may survive summary disposition through indirect evidence by establishing a rebuttable presumption of unlawful action, called the "prima facie" case. *Id*. at 463. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision, which then shifts the burden back to the plaintiff to establish that reason was a mere pretext for an unlawful action. *Id*. at 464-466. If there is sufficient evidence of pretext, summary disposition is inappropriate. *Id*.

Neither our Supreme Court nor this Court have had the opportunity to consider whether courts should address CERA claims under this direct/indirect evidence framework. We see no reason to depart from that well-established metric. CERA's workplace retaliation provision is "analogous to antiretaliation provisions of other employment discrimination statutes and therefore should receive treatment under the standards of proof of those analogous statutes. . . . [T]he policies underlying these similar statutes warrant parallel treatment here. . . ." *DeBrow v Century 21 Great Lakes, Inc*, 463 Mich 534, 539-540; 620 NW2d 836 (2001) (quotation marks and citation omitted); see also *Debano-Griffin*, 493 Mich at 175 (similar).

Relying on cases concerning the general/specific statutory canon of interpretation, plaintiff argues *McDonnell Douglas* is inapplicable because CERA imposes specific restrictions on employers within the more general do-not-discriminate-or-retaliate provisions of the Civil Rights Act. See *Ottgen v Katranji*, 511 Mich 223, 234; 999 NW2d 359 (2023) ("[W]here two statutes conflict, the specific statutory provisions trump more general provisions."); see also *Milne v Robinson*, 513 Mich 1, 13-15; 6 NW3d 40 (2024) (similar). This argument is unpersuasive.

We are not dealing here with conflicting statutes. Rather, *McDonnel Douglas* merely defines the "different evidentiary paths by which to resolve the ultimate issue of the defendant's

discriminatory intent." *Harrison v Olde Financial Corp*, 225 Mich App 601, 610; 572 NW2d 679 (1997) (cleaned up). "It is useful only for purposes of assisting trial courts in determining whether there is a jury-submissible issue on the ultimate fact question of unlawful discrimination." *Hazle*, 464 Mich at 466. And here, the issue comes down to whether or not Workbox terminated plaintiff's employment unlawfully under CERA—i.e., did Workbox fire plaintiff because she was on CERA-protected leave? We see no reason to answer this question any differently than other employment statutes.

## C. ANALYSIS

Plaintiff has not put forth direct evidence, so this case turns on indirect proofs.

## 1. PRIMA FACIE

CERA is a statute relatively unexplored by the courts. As indicated, there is no controlling precedent setting forth the applicable *McDonnell Douglas* test to CERA. But that is not concerning, for "the elements of the *McDonnell Douglas* prima facie case should be tailored to fit the factual situation at hand." *Id*. at 463 n 6. We thus turn to the analogous claims of retaliatory discharge to help set forth a plaintiff's prima facie case obligations, albeit formulating it slightly differently than the trial court: (1) a plaintiff must qualify as a person protected by CERA; (2) the defendant must take an adverse employment action against the plaintiff; and (3) there must be a causal connection between the CERA-protected right and the adverse employment action. See *DeBano-Griffin*, 493 Mich at 175 (Whistleblowers' Protection Act); *Peden*, 470 Mich at 203 (Persons with Disabilities Civil Rights Act); *Smith v Goodwill Indus of West Mich*, 243 Mich App 438, 442-443; 622 NW2d 337 (2000) (Family and Medical Leave Act). Plaintiff has made this showing.

*Person Protected By CERA*. As an employee who tested positive for COVID-19, CERA prohibited plaintiff from reporting to work until one of two events occurred. First is that she was "advised by a healthcare provider or public health professional that [she] . . . completed [her] isolation period." MCL 419.405(1). There is no record evidence demonstrating anyone advised her that her isolation period expired. Nor could there be, because at the time of her positive test, the CDC advised people to isolate for a period of five days,[2] and the available record evidence is

---

[2] See Centers for Disease Control and Prevention, *Summary of Guidance for Minimizing the Impact of COVID-19 on Individual Persons, Communities, and Health Care Systems – United States, August 2022*, <https://www.cdc.gov/mmwr/volumes/71/wr/mm7133e1.htm#F1_down> (accessed March 26, 2026). To be sure, the parties did not submit a copy of the applicable guidelines. But under MRE 201(e), this Court may take judicial notice of these public records which were well-known at the time of plaintiff's leave and not subject to reasonable dispute. See *Johnson v Dep't of Natural Resources*, 310 Mich App 635, 649; 873 NW2d 842 (2015). Moreover, CERA explicitly incorporates the CDC's isolation guidelines. See MCL 419.401(h). So while this Court generally refrains from expanding the record beyond which presented by the parties, we must necessarily determine the then-applicable CDC guidelines to properly evaluate the claims on appeal.

that Workbox was adhering to CDC guidelines.[3]

The second way permitted her to return in the absence of that uncontroverted evidence. In the face of no affirmative instruction from a healthcare provider or public health professional that an isolation period has ended, plaintiff could still have returned if she satisfied four conditions: (a) if she had a fever, 24 hours had passed since it stopped without using fever-reducing medications; (b) the isolation period had passed; (c) her principal symptoms improved; and (d) if she was advised to isolate by a health care provider or public health official to isolate, that she was no longer subject to that advisement. *Id*. Record evidence demonstrates she did not satisfy at least two of these conditions—(a) she no longer had a fever but was using Motrin, a fever-reducing medication; and (c) her primary symptoms had not improved.

Indeed, Workbox does not contest that plaintiff satisfied neither return-to-work criterion. For these reasons, we agree with the trial court that plaintiff is a person protected by CERA.

*Adverse Employment Action*. There is no disputing that Workbox's firing of plaintiff qualifies as an adverse employment action.

*Causal Connection*. Plaintiff can demonstrate a causal connection between her protected activity and her termination. True, "a temporal relationship, standing alone, does not demonstrate a causal connection between the protected activity and any adverse employment action." *West v Gen Motors Corp*, 469 Mich 177, 186; 665 NW2d 468 (2003). But even following *West*, this Court has stated that a "close temporal proximity" can suffice "as long as the evidence would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory basis." *Rymal v Baergen*, 262 Mich App 274, 303; 686 NW2d 241 (2004).

We have here "more than a 'coincidence in time.' " *Debano-Griffin*, 493 Mich at 177, quoting *West*, 469 Mich at 186. A jury would rightfully be skeptical of Workbox's action. In just a few short days after exercising her rights under CERA, Workbox fired her. It did so a mere two hours after it learned she would not be returning to work as planned. And just the day prior, Workbox expressly planned for her return—on Monday, Vance both told plaintiff that they would discuss her return to work when symptom free *and* told another manager that he was working on a plan for Workbox to move her to its Ann Arbor location and "coach" her more from there.

*Debano-Griffin* is instructive. That matter also involved an employee who engaged in protected conduct (questioning a public entity's monetary policy), and an employer that eliminated her position for an asserted legitimate reason ("budget problems") just a short time (less than two weeks) later. 493 Mich at 173. Our Supreme Court held that the employee established a causal connection between the two events because, as pertinent here, she demonstrated the employer was

---

[3] Although plaintiff does not directly make this point, Walker's text message indicating that the isolation period was only three days was not only incorrect, but could be interpreted by a jury that plaintiff's refusal to return to work in just three days and not the five days permitted by the CDC guidance was an act "oppos[ing] a violation of" CERA, MCL 419.403(1)(b), which is a separate protection afforded plaintiff under CERA in addition to the compliance with Section 5 provision discussed above, MCL 419.403(1)(a).

going to fully fund her position in a proposed budget until she engaged in protected conduct:

> Indeed, during a 12–day period when plaintiff made various complaints regarding the funds transfer and ambulance services, plaintiff's position went from fully funded to nonexistent. From this, a rational juror could infer that the board had already decided to fund plaintiff's position until she publicly voiced her complaints. This is especially so because one reasonable conclusion is that the county's financial situation could not have deteriorated in 12 days to the point that it had to consider extreme cost-saving measures at that particular time.

*Id*. (citation omitted). So too here. Plaintiff's return to work went from fully expected to nonexistent within just a few days, if not hours. And "one reasonable conclusion" is that Workbox's evaluation of plaintiff's performance could not have changed so dramatically—from saying let's "coach" her up to firing her—on the same day she informed Workbox that she needed more time to recover as permitted by CERA.

Workbox sees daylight in plaintiff's case because Vance testified Walker made the decision to terminate plaintiff's employment and thus asserts we should discard Vance's let's-move-her-to-Ann-Arbor-and-coach-her-up position just the day before. That is a fair reading from Workbox's point of view. But that is not how we must review the trial court's grant of summary disposition in Workbox's favor under (C)(10).

Instead, viewing the facts in the light most favorable to plaintiff, as we must, without any admissible evidence from Walker on why he fired plaintiff, and knowing Vance supervised plaintiff and was involved in some capacity in evaluating her performance, Vance's wanting to take steps to help plaintiff just one day before supports an inference that retaliatory conduct could equally explain terminating plaintiff's employment. And let us not forget that Vance was Walker's supervisor. Thus, while he may have deferred to Walker's evaluation of plaintiff's daily work performance, a reasonable juror could find his I-wasn't-involved statement incredible. Vance admitted he was ultimately responsible for the firing decisions within his region, told plaintiff he talked to a "higher up" just before her discharge, and told another upper-level manager that *he* wanted to move plaintiff to Ann Arbor upon her return from being sick. In other words, the question of whether Workbox terminated plaintiff's employment based on performance (because Vance says that is what Walker concluded) or that plaintiff was actually scheduled to return to work to be coached up (as Vance's messages state) is best left to the jury; we cannot give credence to one part of Vance's testimony and ignore the rest.

### 2. LEGITIMATE NONDISCRIMINATORY REASON

Having established a prima facie case, the burden shifts to Workbox to articulate a legitimate, nondiscriminatory reason for terminating plaintiff's employment. *Hazle*, 464 Mich

at 464.  For purposes of this appeal only, we assume that it has done so.[4]

## 3. PRETEXT

An employee can establish that an employer's stated legitimate, nondiscriminatory reason is pretexual: "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Debano-Griffin*, 493 Mich at 180 (quotation marks and citation omitted).  At the very least, plaintiff has shown Workbox's asserted reason for terminating her—poor performance—has no basis in fact or, to the extent there were performance problems, those problems were not the actual factors on which Walker and Vance based their decision.  Viewing the evidence in the light most favorable to her, it is reasonable to conclude that Workbox at best thought plaintiff was "coachable" just the day before firing her, with the only thing changing thereafter being her remaining on CERA-protected leave and asserting her right to do so.  That raises a genuine issue of material fact, rendering summary disposition inappropriate. *Id*. at 181-182.  We, therefore, cannot agree with Workbox's argument that Vance's inadmissible hearsay testimony or the unsupported list of five employees sufficiently rebut plaintiff's allegations of retaliation for taking protected COVID-19 leave or her assertion that Workbox's preferred reason for her termination is pretextual.

## 4. CONCLUSION

Like other statutes regulating the workplace, CERA is not a sword drawn by employees to gain an advantage from employers.  Rather, CERA shields employees from unlawful action by employers.  The facts here demonstrate this dynamic, for plaintiff affirmatively wanted to return to work but just could not because she was still sick.  In our view, plaintiff has submitted sufficient evidence to create a genuine dispute of material fact concerning whether Workbox terminated her employment in violation of the CERA.

## III.  STATUTE OF LIMITATIONS

The other issue in this appeal concerns whether the trial court appropriately granted summary disposition under (C)(7) based on a contractually shortened limitations period set forth in her employment agreement.  At the time of the trial court's decision, this Court's caselaw provided that a six-month period of limitations in an employment agreement like the one contained in plaintiff's agreement with Workbox neither violated public policy nor constituted an

---

[4] Workbox's evidence concerning this burden is thin.  There is no admissible evidence from Workbox documenting that it terminated plaintiff's employment for performance reasons as it asserts in this litigation.  Rather, all we have is plaintiff's testimony that Walker told her Workbox "was going in[] another direction."  Workbox's business judgment that another course was appropriate might or might not have been "wise, shrewd, prudent, or competent," but it is one to which courts must defer. *Town v Mich Bell Telephone Co*, 455 Mich 688, 704; 568 NW2d 64 (1997).  But we need not conclusively decide here whether Workbox adequately rebutted plaintiff's prima facie case because even if so, as set forth in our discussion of pretext below, plaintiff has met her burden to establish a question of fact concerning that element of her claim.

unconscionable contract of adhesion. See *Clark v DaimlerChrysler Corp*, 268 Mich App 138, 141-144; 706 NW2d 471 (2005). But the law has changed following the trial court's opinion in this matter, with our Supreme Court overruling *Clark* in *Rayford v American House Roseville I, LLC*, ___ Mich ___; ___ NW3d ___ (July 31, 2005) (Docket No. 163989). Now, courts must evaluate a contractually shortened limitations period contained in an employment agreement for adhesiveness and reasonableness. *Id*. at ___; slip op at 30. Although Workbox asks us to make those determinations in the first instance, "we are a court of review, not first view." *Cutter v Wilkinson*, 544 US 709, 718 n 7; 125 S Ct 2113; 161 L Ed 1020 (2005). We remand to the trial court for further consideration in light of *Rayford*.

## IV. CONCLUSION

For these reasons, we vacate the trial court's judgment and remand for further proceedings. We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Kelly
/s/ Christopher M. Trebilcock